**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **JONATHAN MARCUS GREEN,** | ' | |
| **Petitioner,** | ' | |
| | ' | [H-05-MC-131] |
| **VS** | ' | |
| | ' | |
| **NATHANIAL QUARTERMAN, DIRECTOR,** | ' | |
| **TEXAS DEPARTMENT OF CRIMINAL** | ' | |
| **JUSTICE, INSTITUTIONAL DIVISION** | ' | |
| **Respondent** | ' | |

**ORIGINAL PETITION FOR WRIT OF HABEAS CORPUS
OF A PERSON IN STATE CUSTODY**

TO THE HONORABLE NANCY ATLAS, U.S. DISTRICT COURT JUDGE:

Petitioner, Jonathan Marcus Green, Texas Department of Criminal Justice Inmate No. 999421, is currently confined on death row in the Texas Department of Criminal Justice – Institutional Division's Polunsky Unit located in Livingston, Texas.  Mr. Green petitions this Court, pursuant to Title 28 U.S.C. §2254, to issue a Writ of Habeas Corpus and to order his release from confinement on grounds that his custody violates the Constitution and laws of the United States.  This is an original federal petition in a death penalty case.

## JURISDICTION

This court has personal jurisdiction pursuant to Title 28 U.S.C. § 2241(d) because Mr. Green was convicted in a Montgomery County, Texas, court.  Subject matter jurisdiction is conferred by Title 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

On July 15, 2002, a Montgomery County, Texas, jury convicted Mr. Green of the capital murder of Christina Neal.  On July 17, 2002, the jury answered "special issues" requiring

1

imposition of the death penalty.   On December 1, 2004, in *Green v. State*, No. 74,398 (Tex. Crim. App.), the Texas Court of Criminal Appeals denied relief on direct appeal.   On March 23, 2005, in *Ex Parte Jonathan Marcus Green*, WR-61,225-01, the Texas Court of Criminal Appeals denied Mr. Green's application for writ of habeas corpus. On March 6, 2006, the Supreme Court denied Mr. Green's petition for writ of certiorari taken off his direct appeal.   Mr. Green's federal application is therefore due March 6, 2007.

On January 1, 2006, this Court appointed Michael Maness to draft Mr. Green's federal writ of habeas corpus. *Doc. Entry* # 10.   On December 11, 2006, the Court was notified that Mr. Maness had died.   *Doc. Entry* # 11.   On December 29, 2006, the Court appointed new counsel. In light of issues that could arise due to the AEDPA's statute of limitations, undersigned counsel files this petition.   Undersigned counsel seeks leave below for 180 days to file an amended petition.

## MENTAL HEALTH RELATED CLAIMS

### CLAIM #1

### MR. GREEN IS INCOMPETENT TO BE EXECUTED.

The Eighth Amendment prohibits the execution of someone who lacks capacity to understand the nature and purpose of the punishment about to be imposed on him.  *Smith v. Armontrout*, 857 F.2d 1228, 1230 (8thCir. 1988) (citing *Ford*, *infra*).   The constitutional floor was set by Justice Powell's concurring opinion in *Ford v. Wainwright*:

> "If the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied.  And only if the defendant is aware that his death is approaching can he prepare himself for his passing.   Accordingly, I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." 477 U.S. 399, 422 (1986).

2

Therefore, in determining whether Mr. Green is competent to be executed the ultimate questions are:

> (1)     Is Mr. Green aware of he punishment he is about to suffer;
>
> (2)     Does Mr. Green understand why he is to be put to death.

In other words, the issue is whether Mr. Green understands or perceives an *appropriate* connection between his crime and his punishment.  *Id.*  (emphasis added).

A *Ford* claim challenges the petitioner's competency to be executed, but a determination of competency to be executed can only be determined if an execution date is imminent. *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-645 (1998).  In the Fifth Circuit this means that a determination of competence to be executed must be made "reasonably contemporaneously with the scheduled date for execution." *Billiot v. Epps*, No. S86-0549 (S.D.Miss. 2005) (Memorandum and Order).   Thus, a *Ford* claim is premature, and hence unripe, unless an execution date is impending. If execution is not imminent, such a claim is usually dismissed on ripeness grounds, *see Nguyen v. Gibson*, 162 F.3d 600, 602 (10th Cir. 1998), subject to being re-urged once an execution date has been set. *See Patterson v. Dretke*, 370 F.3d 480 (5th Cir. 2004).

Mr. Green suffers from a serious mental disorder.   He is actively psychotic. Hallucinations are a prominent feature of his psychosis.  He experiences auditory, visual and olfactory hallucinations.  He also experiences command hallucinations. In addition, Mr. Green is paranoid.  These thought disorders disable Mr. Green to the point he is unable to understand why he is to be put to death. Mr. Green is convinced, in fact, that he will be released if only his attorneys will present a judge with papers in the possession of his former attorneys. Mr. Green insists that his trial attorneys assured him that he would file papers with a judge and that once this is done he will be set free.

3

Mr. Green conception of his legal and penal situation is completely irrational.  Mr. Green believes that he is a victim of, or pawn in, some sort of game.  According to Mr. Green, guards at the Polunsky unit are part of the game as are the inmates.  Mr. Green maintained that a guard had told him that he had to play the game.  Those who control the game in the game were making him do things he did not want to do, including self-abuse and mutilation.  Mr. Green's record reflects that he has only one incident involving disobedience of prison personnel; however, he insists that he has been forced to curse at officers and throw feces on them.

The gravity of Mr. Green's psychosis is such that he has problems comprehending his own identity and agency.  This is reflected by his false confession to assaulting guard, and also in his confusion about his sexuality.  Mr. Green indicates that he has male and female features.  He is fearful that players in what he calls the game will compel him to be to be part of the homosexual community and have sex with animals.  Mr. Green is also convinced that others want to be him.  Mr. Green maintains that there was another person called "deuce man" in the unit and he mentioned a woman (perhaps a guard) who used a similar nickname who want to be Mr. Green, not be like Mr. Green, but actually be him.  Mr. Green's confusion about his identity and sexuality affects the content of his hallucinations.  Mr. Green's command hallucinations include commands to penetrate himself, as well as penetrate others.

Mr. Green's deep confusion about himself and his surroundings is revealed by his misunderstanding of changes in his physical appearance due to aging, increased obesity, and dermatological problems caused by his confinement.  Mr. Green believes that individuals whom he thinks are responsible for his hallucinations have caused the skin on his arms shift in different places.  Mr. Green is further obsessed with a growth on his scalp which he believes the Polunsky unit or forces within it have somehow intentionally caused.

4

Although Mr. Green is aware he had a trial and can name his attorneys as well as the presiding Judge, his idea of what happened at trial is interwoven with strange beliefs centering on sexually conduct. Mr. Green maintained that the judge presiding at trial, Suzanne Stovall had her eyes closed for long periods during trial.  Mr. Green said that he saw Judge Stovall let a juror look between her legs.  Mr. Green said that co-counsel at trial, Gerald Crow, did not want to help him.  Mr. Green said that Mr. Crow was worried about not having any nuts and not being able to get his wife pregnant.  Mr. Green is convinced that Judge Stovall had a dildo between her legs explaining why her eyes were closed.

An execution date has not been set in this case.  Mr. Green, however, is incompetent to be executed.  Should an execution date be set, this Court should order relief from his sentence of death because Mr. Green is not competent under standards established by the Supreme Court in *Ford v. Wainwright*.

## CLAIM #2

### MR. GREEN'S RETARDATION MEANS HIS DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT.

On June 20, 2002, the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibits the execution of individuals with mental retardation.  Reversing its prior decision in Penry I, the Court concluded that "the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender."  *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) (internal quotation marks omitted).  The Supreme Court rested its conclusion on two grounds.

First, the Supreme Court found persuasive that, at the time of Penry I in 1989, only two death penalty states and the federal government had banned the execution of mentally retarded

offenders. *Id.* at 314.  However, since that time, an additional sixteen states had prohibited the use of the death penalty for the mentally retarded.  The Supreme Court noted that it "is not so much the number of States that is significant, but the consistency of the direction of change." *Id.* at 315.  These enactments, "[g]iven the well-known popularity of anticrime legislation," provided the Supreme Court with "powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.*  In its search for a national consensus, the Supreme Court relied upon the fact that the legislatures passing the laws voted "overwhelmingly in favor of the prohibition." *Id.*  The Supreme Court also looked to the opinions of social and professional organizations with "germane expertise," such as the American Psychological Association, the opposition to the practice by "widely diverse religious organizations," international practice, and polling data. *Id.* at 316 n.21.  While "not dispositive," these factors bolstered the Supreme Court's opinion that a consensus opposing the practice existed "among those that have addressed the issue." *Id.*  Finally, the Supreme Court noted that even in those states that retained the death penalty for the mentally retarded, only five had actually carried out the execution of a mentally retarded individual since Penry I. *Id.* at 316.  Because the practice had become "truly unusual," it was "fair to say," according to the Supreme Court, that "a national consensus has developed against it." *Id.*

The second reason the Supreme Court advanced for banning the execution of the mentally retarded was that "this consensus unquestionably reflects widespread judgment about the relative culpability of mentally retarded offenders and the relationship between mental retardation and the penological purposes served by the death penalty." *Id.* at 317.  The Supreme Court noted that, due to their impairments, defendants with mental retardation "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and

learn from experience, to control impulses and to understand the reactions of others." *Id.*  These deficiencies, the Supreme Court held, while not justifying an exemption from criminal liability, do diminish a mentally retarded person's personal culpability to the extent that neither of the justifications advanced by states in support of the death penalty – retribution and deterrence – would be served by permitting a retarded person's execution.  *Id.*

Retribution in the capital context had been limited to ensuring that "only the most deserving of execution are put to death."  *Id.* at 319.  Because the "just deserts" rationale necessarily depends on the culpability of the offender, the most extreme punishment was deemed excessive due to the "lesser culpability of the mentally retarded offender."  *Id.*  And, because capital punishment can serve as a deterrent only when a crime is the result of premeditation and deliberation, no deterrence interests are served.  *Id.*  This type of calculus, the Supreme Court noted, is at the "opposite end of the spectrum" from the behavior of the mentally retarded because of their cognitive and behavioral impairments.  *Id.*

The Supreme Court also opined that, due to the impairments of mentally retarded individuals, a host of factors – from the increased risk of false confessions, difficulties in communicating with counsel, and their lesser ability due to limited communication skill to effectively testify on their own behalf or express remorse – created, "in the aggregate," an unacceptable "risk of wrongful executions" for mentally retarded defendants.  *Id.* at 321.  In short, the Supreme Court held that its "independent evaluation of the issue reveals no reasons to disagree with the judgment of the legislatures that have . . . concluded that death is not a suitable punishment for a mentally retarded criminal," and thus the Constitution "places a substantive restriction on the State's power to take the life of a mentally retarded offender."  *Id.* (internal quotation marks omitted).

**B.      The Standard for Determining Mental Retardation**

The American Association on Mental Retardation ("AAMR") defines mental retardation

as: (1) subaverage general intellectual functioning (i.e., an IQ of approximately 70 to 75 or

below) that exists concurrently with (2) related limitations in two or more adaptive skill areas

(communication, self-care, home living, social skills, community use, self-direction, health and

safety, functional academics, leisure, and work), and (3) onset before the age of eighteen.

American Association on Mental Retardation, MENTAL RETARDATION: DEFINITION,

CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992) [hereinafter "1992

AAMR Manual"].  The American Psychiatric Association's Diagnostic and Statistical Manual of

Mental Disorders ("DSM-IV-TR") employs a definition that is nearly identical to the one set out

in the 1992 AAMR Manual.     The Supreme Court has expressly relied on the 1992 AAMR

Manual's three-prong definition of mental retardation, see Atkins, 536 U.S. at 309 n.3; Penry I,

492 U.S. at 307-09 n.1, as has this Court.  See Ex parte Tennard, 960 S.W.2d 57, 60-61 (Tex.

Crim. App. 1997).

In late May 2002, the AAMR released the latest version of its manual.  Mental

retardation is redefined as "a disability characterized by significant limitations both in

intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical

adaptive skills.  This disability originates before age 18."  American Association on Mental

Retardation, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS

OF SUPPORTS 1 (10th ed. 2002) [hereinafter "2002 AAMR Manual"].  The three diagnostic

criteria are the same, but the new manual places a greater emphasis on adaptive behavior deficits

and describes those deficits in a different way.  In the 2002 AAMR Manual, adaptive behavior is

described as "the collection of conceptual, social, and practical skills that have been learned by

8

people in order to function in their everyday lives." *Id.* at 73.  In assessing deficits in adaptive behavior, the 2002 AAMR Manual stresses that "[l]imitations in adaptive behavior affect both daily life and the ability to respond to life changes and environmental demands." *Id.* at 91.  The 1992 AAMR Manual defined adaptive behavior by focusing on ten specific skills.  The 2002 AAMR Manual shifts to three broader domains of adaptive behavior.  The three broader domains of conceptual, social, and practical skills in the new definition "are more consistent with the structure of existing measures [of adaptive behaviors] and with the body of research on adaptive behavior." *Id.* at 73.  As the 2002 AAMR Manual illustrates, however, the ten skill areas listed in the 1992 definition can be conceptually linked to one or more of the three domains in the 2002 definition of mental retardation:

The first prerequisite for a diagnosis of mental retardation is severely impaired cognitive functioning.  The second requirement serves to confirm the reality of the psychometric measurement of the individual's severe impairment.  The impairment must be observed to have "real-world" effects on the individual's life functioning.  As the Supreme Court has noted, all people with mental retardation "have a reduced ability to cope with and function in the everyday world." *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 442 (1985).  The requirement of real, identifiable disabling consequences in the individual's life – of reduced ability to "cope with common life demands," DSM-IV-TR 42 – assures that the diagnosis applies only to persons with an actual, functional disability.  See 1992 AAMR Manual at 38.  Previous versions of the definition of mental retardation expressed this requirement in terms of  "deficits in adaptive behavior," see Penry I, 492 U.S. at 308 n.1 (citing an earlier edition of the AAMR's classification manual), while more recent formulations employ the terms "related limitations" in "adaptive skill areas."  1992 AAMR Manual at 5; see DSM-IV-TR 42.  According to the 2002

9

AAMR definition, the significant limitations in adaptive functioning are expressed in "conceptual, social, and practical adaptive skills."  2002 AAMR Manual at 73.  Both sets of terms reflect the same concept: that the impairment in intellectual ability must have an actual impact on everyday functioning.  See *id*. at 74 ("most adaptive behavior instruments measure the skill level a person typically displays when responding to challenges in his or her environment") (internal quotation marks omitted).

The third prong of the definition of mental retardation is that the disabling condition must have manifested itself during the developmental period of life, before the individual reaches the age of eighteen.  Requiring the disability to have occurred at birth or during childhood means that the individual's mental development during his or her crucial early years was affected by the impairment of the brain's ability to function.  This element of the definition is derived from the understanding of modern neuroscience about the way the brain develops and the implications of its arrested development for cognitive impairment.  See 1992 AAMR Manual at 16-18.  The 2002 AAMR Manual identifies four main categories of risk factors for mental retardation – biomedical, social, behavioral, and educational – that can occur at the prenatal, perinatal, or postnatal stage of development.  See 2002 AAMR Manual, Table 8.1, at 127.  In practical terms, it means that any individual with mental retardation not only has a measurable and substantial disability now, but that he or she also had it during childhood, significantly reducing the ability to learn and gain an understanding of the world during life's formative years.

Mr. Green exhibits clear signs of subnormal intelligence.  However, Mr. Green is refractory to any psychometric evaluation.  That is to say he refuses to submit to psychological or neurological testing.  Mr. Green's academic history indicates that he is functionally illiterate and innumerate.  Mr. Green may have graduated from Montgomery County High School.

However, it appears the reason why he advanced through the school system had to do with his ability to play football, not with his ability to marginally comprehend basic academic material.

Mr. Green's mental deficits clearly have had "real-world" effects on his life functioning. Mr. Green was unable to hold menial jobs. After his mother died he was unable to maintain a household. He lived in rank squalor and could not manage basic tasks including minimal tasks of maintaining personal hygiene.

Mr. Green's subnormal intellect manifested itself early in his life. School records reflect consistently poor performance. Family history indicates that Mr. Green lagged behind other children in mental performance. However, these deficiencies were overlooked starting at an early age because of his physical prowess.

Because Mr. Green suffers from mental retardation, this Court should grant relief from his sentence of death, as executing him would violate the Eighth Amendment.

## CLAIM # 3

**MR. GREEN'S INCIPIENT MENTAL ILLNESS AND BORDERLINE INTELLIGENCE RENDERED HIM VOLITIONALLY INCAPACIATED; THUS, HIS DEATH SENTENCE IS CRUEL AND UNUSUAL PUNISHMENT.**

Mr. Green's case calls for an extension of *Atkins v. Virginia* to individuals suffering from mental illness. The core Eighth Amendment concept is the "'dignity of man,'" and thus its constitutional content must be informed by "'the evolving standards of decency that mark the progress of a maturing society.'" *Id.* at 2247 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958)). The evolving standard, the Court declared, should be informed by "objective factors" to the maximum extent possible; the most reliable evidence of which is found in state legislative enactments and jury verdicts.

11

In *Atkins v. Virginia*, the Supreme Court declared that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibited the execution of individuals with mental retardation.  *Atkins* relies upon three related rationales: The empirically established consensus against executing the mentally retarded; the Court's independent determination that retaining the death penalty for the mentally retarded would not further any interest in retribution or deterrence; and the fact that the nature of the impairment of mentally retardation leads to an unacceptable "risk of wrongful executions.  All three of these rationales apply equally to persons, such as Mr. Green, who are unable to control their conduct due to mental illness.

A.     **The Legal Landscape Regarding Defendants Unable to Conform their Conduct**

      1. **Analysis of State Statutory Law**.

The proper question for conducting the empirical analysis is how many states preclude death sentences for defendants who "lacked sufficient capacity to conform their conduct to the requirements of the law."  Nineteen of the twenty states whose laws explicitly address the question of whether conduct the defendant was powerless to avoid may serve as the basis for a death sentence have concluded that it may not.  In seventeen states, the trial court's fact finding concerning the petitioner's volitional capacity would have shielded the applicant from all criminal responsibility and all punishment.  Ark. Stat. Ann. §5-2-312 (1995); Conn. Gen. Stat. § 53a-13 (1994); Ga. Code Ann. §16-3-2 (1996); Haw. Rev. Stat. §704-400(1996); Ky. Rev. Stat. Ann. §504.020 (Michie 1995); Md. Health-Gen. Code §12-108 (1995); Mich. Stat. Ann. §28.1044(1); Or. Rev. Stat. § 161.295(1995); 13 Vt. Stat. Ann. § 4801 (1995); Wis. Stat. 971.15 (1994); Wyo. Stat. 7-11-304(1996); *Commonwealth v. McHoul*, 226 N.E. 2d 556 (Mass. 1967); *State v. Cegelis*, 638 A. 2d 783 (N.H. 1994); *State v. White*, 270 P. 2d 727 (N.M. 1954); *State v.*

*Johnson*, 399 A.2d 469 (R.I. 1979); *Thompson v. Commonwealth*, 70 S.E. 2d 284 (Va. 1952); *State v. Myers,* 222 S.E. 2d 300 (W.V. 1976).  In addition, in Montana, criminal liability may be found but the death penalty may not be imposed on a defendant if the existence of a mental disease or defect at the time of the offense rendered the defendant unable to conform his behavior to the requirements of law one.  *See,* Mont. Code Ann. § 46-14-102 (1995).  Finally, in New York, it is an affirmative defense to murder that the defendant "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be."  N.Y. Penal L. §125.27 (Consol. 1996).

Of the seventeen states that have a volitional prong as part of their insanity defense, seven do not presently have a death penalty.  Nevertheless, they contribute equally to the legislative consensus that the death penalty may not be imposed based upon conduct the defendant was powerless to avoid.  It is not their prohibition of the death penalty, but their recognition of the radically lesser culpability of nonvolitional actors that contributes to this consensus.  Cf. *Stanford v. Kentucky*, 492 U.S. 361, 371 n.2 (1988) (abolitionist states reveal nothing about the proportionality of executing sixteen- and seventeen- year olds.)  If any of these seven states were to enact a death penalty tomorrow, persons who were volitionally incapacitated would be ineligible for death sentencing for precisely the same reason they are presently ineligible in the ten death penalty volitional prong states: because such persons are deemed undeserving of any criminal sanction at all.

More importantly, for none of the *M'Naghten* death penalty states is an inference of approval warranted from silence.  In states with very small death row populations, such as

13

Colorado, Kansas, Nebraska, New Jersey, and Washington, the dearth of death penalty cases means that no valid inferences can be drawn about the views of sentencing juries or the interpretation of state law that would be made on this issue.

In at least five additional states--Arizona, Florida, Mississippi, Ohio and Nevada--proportionality review has served to remove many mentally ill offenders from the ranks of the condemned despite the apparent availability of capital punishment in such cases. *See e.g., State v. Jimenez,* 799 P.2d 785, 797-801 (Ariz. 1990) (reducing death sentence to life imprisonment based on defendant's mental incapacity); *State v. Fierro*, 804 P.2d 90 (Ariz. 1990) (death penalty held disproportionate due in part to defendant's "history of psychological illness"); *State v. Doss*, 568 P.2d 1054, 1061 (Ariz. 1977)(same); *Jones v. State*, 332 So.2d 615, 619 (Fla. 1976) (reducing death sentence to life based on evidence of defendant's mental illness); *Burch v. State*, 343 So.2d 831 (Fla. 1977) (same); *Huckaby v. State*, 343 So.2d 29 (Fla. 1977) (evidence of mental illness outweighed evidence in aggravation and required reduction of sentence from death to life imprisonment; while defendant "may have comprehended the difference between right and wrong his capacity to appreciate the criminality of his conduct and to conform it to the law was substantially impaired"); *Knowles v. State,* 632  So. 2d 62 (Fla. 1993) (mitigating factors of defendant's mental illness, including his impaired capacity to control his conduct outweighed aggravating factors); *Besaraba v. State*, 656 So 2d 441 (Fla. 1995) (death sentence overturned where defendant was under the influence of great emotional disturbance); *State v. Claytor,* 61 Ohio St. 3d 234 (1991) (where defendant produced unrebutted evidence that he lacked substantial capacity to conform, impact of that mitigating factor should have been given more weight and a life sentence imposed); *Edwards v. State*, 441 So.2d 84, 92-94 (Miss. 1983) (plurality opinion) (vacating death sentence based on offender's mental illness); *Haynes v. State*,

14

103 Nev. 309, 739 P.2d 497 (1987) (vacating as disproportionate death sentence imposed on mentally ill offender).  While these proportionality decisions do not correspond precisely to the so-called "irresistible impulse" category at issue here, they sweep in offenders *less* impaired than the petitioner, and help explain why these state courts may not have had to squarely face the issue of the permissibility of death sentences for conduct the defendant was incapable of controlling.  Moreover, the fact that these jurisdictions have used proportionality review to strike down sentences of mentally ill offenders whose illness has left them with *some* capacity to control their conduct suggests that they might well adopt a per se rule prohibiting the execution of offenders totally lacking in that capacity if such an offender were in fact sentenced to death in that jurisdiction.

There remain three states on the state court's list--California, Idaho and Louisiana--which have imposed and affirmed relatively large numbers of death sentences, and which have neither any formal method of determining whether mentally ill defendants meet the "irresistible impulse" test nor a record of reversing death sentences of mentally ill offenders on proportionality grounds.  But even these jurisdictions do not reflect, for eighth amendment purposes, any "considered judgment approving the imposition of capital punishment" on mentally ill offenders who were unable to conform their conduct.  *Thompson v. Oklahoma,* 487 U.S. 815, 852 (1988) (O'Connor, J., concurring).  Rather, like the states' laws governing waiver of juvenile offenders for trial as adults which were considered in *Thompson,* the states' substantive insanity standards reflect a myriad of legislative considerations far more pressing than their theoretical effect on eligibility for capital punishment.  487 U.S. 815, 852 (1988).  A state's decision to reject or abandon use of the capacity-to-conform prong of criminal responsibility simply does not constitute reliable evidence of a legislative or public attitude in

favor of using the death penalty in such cases. *Thompson v. Oklahoma, supra.* In the absence of actual death sentences and executions of volitionally incapacitated offenders, the lack of legislative or judicial preclusion of such sentences is similarly ambiguous; silence under these circumstances signifies neither approval nor disapproval. Moreover, even these states have not been entirely silent on the issue; all three recognize *impaired* capacity to conform conduct to legal requirements as a statutory mitigating factor. Cal. Penal Code § 190.3 (Deering 1996); Idaho Code § 19-2523 (1996); La. Code Crim. Proc. Art.905.5 (1996). One plausible inference from these statutory mitigation schemes is that legislators anticipated that, at the extreme, those rare cases where the defendant possesses *insufficient* capacity to conform his conduct to the law, juries instructed on the mitigating significance of *impaired* capacity will not impose the death penalty. While this is not the only possible inference from the overall statutory schemes, it is at least as likely as the silence-equals- approval inference. Indeed, as discussed below in Part IV.A. 1, if legislators have assumed that juries will give life sentences in extreme cases of impaired volitional capacity, such an assumption would seem to comport with the actual behavior of juries.

Thus, speculation about silent states can run in either direction, but no state has by express legislative enactment rendered offenders who lacked sufficient capacity to conform their conduct to the requirements of law eligible for capital punishment, and except for the decision in this case, no court has ever so construed the laws of any American state to permit such a result. At least nineteen states' laws preclude the possibility of such a sentence, and this virtual unanimity among those states whose laws speak directly to this issue more than establishes the "evolving standard of decency" that precludes the execution of a class of offenders. *Atkins v.*

*Virginia*, 122 S.Ct. 2242 (2002); *Coker v. Georgia*, 433 U.S. 584 (1977); *Enmund v. Florida*, 458 U.S. 782 (1982); *Thompson v. Oklahoma*, 487 U.S. 815 (1988).

### 2.  Behavior of sentencing juries.

The silence of many death penalty states on the question of the death eligibility of a person totally lacking in the ability to control his conduct may be attributable to the screening behavior of prosecutors and the sentencing behavior of juries.   The latter is itself another "significant and reliable objective index of contemporary values" regarding a given punishment. *Gregg v. Georgia*, 428 U.S. 153, 181 (1976); *Coker v. Georgia*, 433 U.S. 584, 596 (1977). Assessing the willingness of juries to impose death sentences on defendants *who have been formally determined* to lack the capacity to conform their conduct to the law is undeniable problematic, for the revealing reason that in only two states--South Carolina and Pennsylvania-- are such sentences *even theoretically* possible.   In these two states, it does not appear that death has been made available as a sentencing option to juries in any significant number of cases.

It is possible that some offenders that juries  *believed* were unable to control their conduct were sentenced to death, but that no record has been left of that finding because the statutory structure does not ask the jury to make such a determination.   But certainly, if such situations were *common*, one would expect reviewing courts to occasionally consider the evidence of volitional incapacity so strong that they would be forced to address the question of whether volitionally incapacitated defendants are death eligible.   Indeed, the imposition of death sentences on such volitionally impaired offenders by American juries is so infrequent as to be virtually unknown.  *Cf. Atkins v. Virginia*, 122 S.Ct. 2242, 2249 (2002) (deeming the practice of executing the mentally retarded "truly unusual" because it was limited to *five states*).   If ever

17

there was a punishment whose "freakish" rarity establishes its unconstitutionality under the Eighth Amendment, it is this one.

### 3. Public opinion.

Public opinion, as reflected by polling data and by informed public commentary, may in some cases shed additional light on contemporary societal norms regarding criminal punishments.  *See Atkins v. Virginia*, 122 S.Ct. 2242, 2249 n. 21 (2002) (reviewing public opinion survey data and positions of pertinent professional associations on question of executing mentally retarded offenders).  Nearly every major mental health association in the United States has published a policy statement addressing the umbrella issue of the execution of mentally ill offenders, and all of those organizations advocate either an outright ban on executing *all* mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be implemented.  Although these organizations differ on whether to outlaw or suspend such executions, they unanimously agree that the current capital punishment system inadequately addresses the complexity of cases involving mentally ill defendants.  American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 2000), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death penalty in the United States*, National Alliance for the Mentally Ill, *The Criminalization of People with Mental Illness*; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved March 10, 2001).

Specifically, the National Mental Health Association (NMHA) found that the fact-finding portion of capital trials "fails to identify who among those convicted and sentenced to death actually has a mental illness."  NMHA, Death Penalty and People with Mental Illness.  Similarly, the American Psychological Association (APA) argued that too many "[p]rocedural problems, such as assessing competency," render capital punishment unfair to the mentally ill.  APA, Resolution on the Death Penalty in the United States.  Such procedural inadequacies fall far short of the "basic requirements of due process," according to the American Psychiatric Association

(AMPA).  AMPA, Moratorium on Capital Punishment in the United States.  Thus, the NMHA, APA, and AMPA believe that the criminal justice system routinely executes many mentally ill individuals without realizing that any illness existed and, therefore, without considering that illness as a mitigating factor.  All of these organizations favor a moratorium.  The National Alliance for the Mentally Ill (NAMI) has voiced a stronger opinion, advocating for an outright ban on death sentences for individuals with any type of brain disorder.   NAMI, The Criminalization of People with Mental Illness.  NAMI asserts that the overwhelming number of violent acts committed by the mentally ill is the result of neglect or inadequate treatment of the illness – as was present in petitioner's case– and concludes that the answer therefore is "treatment, not punishment."  NAMI, The Criminalization of People with Mental Illness.

It is obvious from these general statements about a wide range of mentally ill offenders that these organizations would be even more adamant about the execution of persons as severely mentally ill as the petitioner.  The reason for the paucity of direct evidence of public and expert attitudes towards the execution of the subcategory of mentally ill defendants who lack the capacity to control their behavior is not hard to discern.  The issue is no longer a subject of investigation or public debate because such executions are by and large nonexistent.  The use of the death penalty as a punishment for essentially involuntary crimes has long ago disappeared both from our society's arsenal of criminal sanctions and from our public consciousness.  And, but for this one anomalous case, the subject might never have been raised again.

For all of these reasons, the sentence pronounced upon Mr. Green in this case is, without doubt, "opposed by a national consensus, sufficiently uniform and of sufficiently long standing, to render it cruel and unusual punishment within the meaning of the Eighth Amendment." *Thompson v. Oklahoma, supra*, 487 U.S. at 859 (Scalia, J., dissenting).  The Eighth Amendment

analysis applied by the Court to assess the constitutionality of the death penalty for the mentally retarded, *Atkins v. Virginia*, *supra*,  for rapists, *Coker v. Georgia, supra*, for nontriggermen, *Enmund v. Florida*, *supra*, and for fifteen year olds, *Thompson v. Oklahoma, supra* clearly establishes the inadmissibility of the sentence imposed in this case.  The categories of death sentences struck down in *Atkins, Coker, Enmund* and *Thompson* appeared to have been rarely authorized and rarely imposed, but they were not wholly unknown.  If the sentences imposed on Atkins, Thompson, Coker, and Enmund constituted cruel and unusual punishment, the sentence imposed on Mr. Green surely does as well.

### B.   Applicant's Sentence is Grossly Disproportionate to His Personal Moral Culpability and Lacks Penological Justification.

#### 1.  Petitioner's moral culpability does not warrant a death sentence

A sentence that is "grossly out of proportion to the severity of the crime" violates the Eighth Amendment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell and Stevens, JJ.)  Determination of the proportionality of a capital sentence cannot be based solely upon the magnitude of harm resulting from the offense "[[F]or purposes of imposing the death penalty. . . punishment must be tailored to [a defendant's] personal responsibility and moral guilt.  *Enmund v. Florida,* 458 U.S. 782, 801 (1982).  See also *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J. concurring) ("[P]unishment should be directly related to the personal culpability of the criminal defendant.")  Thus, in considering claims that particular categories of convicted murderers are not constitutionally punishable by death, the Supreme Court has always focused on the offenders' moral culpability and their degree of personal responsibility for the harm resulting from the offense.  *Atkins v. Virginia*, *supra* (death penalty unconstitutional for mentally retarded offenders); *Enmund v. Florida*, *supra* (death penalty unconstitutional for minor participant who did not intend to kill); *Tison v.*

*Arizona*, 481 U.S. 137 (1986)(death penalty not unconstitutional for nontriggerman who was major participant in dangerous felony and acted with reckless indifference to human life); *Thompson v. Oklahoma*, 487 U.S. 815(1988)(death penalty unconstitutional for offenders under sixteen); *Stanford v. Kentucky*, 492 U.S. 361 (1989)(death penalty not unconstitutional for sixteen- and seventeen- year-old offenders).

When the Supreme Court accepted the contention that mentally retarded murderers are *categorically* so lacking in moral blameworthiness as to be ineligible for the death penalty, its rationale for doing so compels the conclusion that the volitionally incapacitated are likewise ineligible.[1]  The Court noted the obvious cognitive limitations of the retarded, but also stressed their "diminished capacity . . . to control impulses, and the "abundant evidence that they often act on impulse rather than pursuant to a premeditated plan," characterizations that have even greater applicability to those who because of mental illness are completely unable to conform their conduct to the requirements of the law.  Moreover, this inference as to the moral centrality of volitional control is corroborated by the Court's reasoning in determining that execution of persons under the age of sixteen violates the Cruel and Unusual Punishments Clause.  In discussing the lesser "personal culpability" of adolescents, the court cited with approval the following passage from the 1978 Report of the Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders:

> Adolescents, particularly in the early and middle teen years, are more vulnerable, more impulsive, and less self-disciplined than adults.  Crimes committed by youths may be just as harmful to

---

[1]  Indeed, even *prior* to Atkins, petitioner's ineligibility for the death penalty ought to have been clear because *Penry's* rationale strongly implied the ineligibility of persons who were volitionally incapacitated.  The *Penry* Court was careful to note that by rejecting Penry's insanity defense and convicting him of capital murder under Texas law, the jury had necessarily found "that Penry knew that his conduct was wrong *and was capable of conforming his conduct to the requirements of the law.*"  492 U.S. 302,333 (emphasis added).  This second finding was the diametric opposite of what the trial judge found to be true of the petitioner.  Thus, the petitioner lacked one of the two characteristics that the *Penry* Court found to be crucial in ascribing to Penry sufficient moral responsibility to justify the death penalty.

> victims as those committed by older persons, b*ut they deserve less*
> *punishment because adolescents may have less capacity to control*
> *their conduct and to think in long-range terms than adults. . .*

*Thompson*, 487 U.S. 815,834 (1988)(emphasis added).  Certainly if crimes committed by the

retarded and by young adolescents deserve less punishment due to those groups' *lesser* capacity

to control their own conduct, the crimes of persons who, by reason of mental illness, lack even

*sufficient* capacity to control their conduct are also deserving of less than the most severe

punishment.

> **2.     Neither retribution nor deterrence are served by petitioner's death
> sentence.**

A capital sentence violates the Eighth Amendment when it is "so totally lacking in

penological justification that it results in the gratuitous infliction of suffering.  *Gregg v. Georgia*,

428 U.S. 153, 183 (1976)(joint opinion of Stewart, Powell, and Stevens, J.J.).  Unless the death

penalty "measurably contributes" to either the goal of deterrence or the goal of retribution, it is

"nothing more than the purposeless and needless infliction of pain and suffering," and therefore

an unconstitutional punishment.  *Enmund v. Florida*, 458 U.S. 782,798(1982).   Neither

retribution nor deterrence is served by the execution of defendants whose mental illness rendered

them powerless to avoid criminal conduct.

Whether a defendant possesses that "degree of culpability associated with the death

penalty," *Penry*, 492 U.S. at 338, cannot be resolved by reliance on state law definitions of

crimes and defenses.  Although "[s]tates have the authority to make aiders and abettors equally

responsible with principals, or to enact felony murder statutes," *Lockett v. Ohio*, 438 U.S.

586,602 (1978)(plurality opinion), minor participation in a felony that results in an unanticipated

death does not evidence sufficient "moral culpability" to justify the imposition of a death

sentence on retributive grounds.  *Enmund v. Florida*, 458 U.S. 782,798-801 (1982); *see also*

*Atkins v. Virginia*, 122 S Ct. 2242, 2250-51 ("[The] deficiencies [of mentally retarded offenders] do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.")  Once a fact finder has determined that a defendant's mental illness has deprived him of sufficient capacity to avoid criminal behavior, there can be no measurable contribution to retribution, but only the "exacting of mindless vengeance" forbidden by the Eighth Amendment. *See Ford v. Wainwright*, 477 U.S. 399, 410 (1986) (execution of the insane amounts to the "exacting of mindless vengeance.")

Deterrence cannot justify imposing the death penalty upon these volitionally incapacitated defendants because by definition, those whose mental disorders robbed them of the capacity to conform their conduct to the requirements of law are incapable of responding to legal rules.  *Cf. Harris v. State*, 499 N.E. 2d 723 (Ind. 1986), *cert. denied*, 482 U.S. 909 (1987)(deterrence rationale may support execution of Indiana guilty but mentally ill (GBMI) offenders where  state law defines GBMI offenders as  "not defendants who fully lacked the capacity to conform their conduct to the law.")  In *Thompson v. Oklahoma*, 487 U.S. 815 (1988), the Supreme Court observed that for murderers under the age of sixteen," the likelihood that the offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Id.* at 837.  Young offenders, however, are merely *extremely unlikely* to make choices about unlawful behavior based on possible penalties, whereas those who lack sufficient the capacity to conform their conduct to the law *can not* make choices about unlawful behavior, regardless of the stakes.  Indeed, just as it is for mentally retarded offenders, the "cold calculus" of cost and benefit is "at the opposite end of the spectrum of behavior" *Atkins* at 2251, of those who cannot control their own conduct.  Finally, as the Supreme Court also noted concerning an exemption of the retarded from the death penalty,

exempting those who are unable to conform their conduct to the requirements of the law will not lessen the deterrent effect upon other offenders.  *Id.*

Thus, both logic and precedent dictate the conclusion that the death penalty can serve no deterrent purpose when applied to defendants who lacked sufficient capacity to avoid their criminal acts.  Because the capital sentencing of persons determined to be unable to control their conduct amounts to execution for essentially nonvolitional conduct, neither retribution nor deterrence are thereby measurably advanced.

### C. Capital Prosecution of Volitionally Incapacitated Offenders Carries Heightened Risks of Unjustified Executions.

In *Atkins*, the Supreme Court cited the enhanced risk faced by retarded defendants "that the death penalty will be imposed in spite of factors which may call for a less severe penalty," *Atkins* at 2251, quoting *Lockett v. Ohio*, 438 U.S. 586, 60065 (1978), as a second justification for the national consensus that they should be categorically excluded from eligibility for the death penalty. Volitionally incapacitated defendants such as petitioner face similar obstacles in "mak[ing] a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors." *Id* at 2252.

Any defendant whose mental illness at the time of the offense rendered him unable to conform his conduct to the requirements of law is a defendant suffering from severe mental illness.  Severe mental illness, just as significant cognitive limitations, sharply constrict a defendant's ability "to give meaningful assistance to their counsel." *Atkins* at 2252.  As petitioner's case aptly illustrates, volitional incapacity (as distinguished from *impaired* capacity) is frequently the consequence of hallucinations and/or delusions.  Hallucinations and delusions diminish the defendant's ability to report in two distinct ways: They impair his ability to accurately observe, and, particularly where the delusions are paranoid (as petitioner's were), they

cause mistrust of persons attempting to help, and consequently impair willingness to cooperate with defense attorneys.  Thus, whether the question is the accuracy of aggravating details of the crime or the existence of mitigating circumstances, a severely mentally ill defendant is less able assist his attorney in giving presenting "factors which may call for a less severe penalty." *Id*.  A second impediment to effective defense of the volitionally incapacitated lies in the fact that defendants who are unable to conform their conduct to the requirements of law usually are equally unable to conform their conduct to the requirements of courtroom decorum and procedure.  They therefore "are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Atkins* at 2252.  Moreover, when such defendants are medicated in an attempt to reduce psychotic symptoms and restore competence (as petitioner was), the resulting synthetic competence is likely create its own significant impediments to cooperation with attorneys and a stoney-faced demeanor likely to be read as indifference. *See Riggins v. Nevada*, 504 U.S. 127. 142 (Kennedy, J., concurring) ("[D]rugs [that restore competence] can prejudice the accused in two ways: (1) by altering his demeanor in a manner that will prejudice his reactions and presentation in the courtroom and (2) by rendering him unable or unwilling to assist counsel.")

Finally, mental illness that disables a defendant from controlling his own conduct "can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." *Atkins* at 2252.  Indeed, it is hard to imagine a fact about a defendant that would engender greater fear of future violence, and yet would not reflect moral culpability on his part.

Thus, the weight of national consensus is substantially greater in petitioner's case than it is with respect to mentally retarded defendants, and an "independent evaluation of the issue

reveals no reason to disagree with [that] judgment. . . " *Atkins* at 2252. Petitioner's death sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment.

### CLAIM # 4

**EXECUTING MR. GREEN WOULD VIOLATE THE EIGHTH AMENDMENT, SINCE EXECUTING THE MENTALLY ILL IS CONTRARY TO PUBLIC OPINION, SERVES NO PENOLOGICAL PURPOSE, AND LEADS TO AN UNACCEPTABLE RISK OF WRONGFUL EXECUTION.**

Even if Mr. Green was not volitionally incapacitated at the time of the crime, executing him in light of the present gravity of his mental illness would violate the Eighth Amendment to the Constitution.  The rationales enunciated in *Atkins v. Virginia* for not executing individuals suffering from mental retardation apply with equal or greater force to individuals suffering from severe psychotic disorders.  There is a growing consensus against executing the mentally ill; imposing the death penalty on the severely mentally ill does not further any interest in retribution or deterrence; and the nature psychotic illness leads to an unacceptable "risk of wrongful executions."

### 1. Growing opposition to executing the mentally ill

The reasons stated in Claim #3, subsection A, 3, for finding a consensus against executing severely mentally ill defendants is incorporated by reference as if full set forth herein.

### 2. Lack of penological justification.

The reasons stated in Claim #3, subsection B, 2, for finding a consensus against executing severely mentally ill defendants is incorporated by reference as if full set forth herein.

### 3. Unacceptable risk of wrongful execution.

Psychotic illnesses are probably misunderstood by laypersons even more so than mental retardation. In particular, schizophrenic type diseases such as the one Mr. Green suffers from, are

still mistakenly viewed as a Jekyll and Hyde affliction.[2]   However, individuals who have this disease suffer from multiple symptoms rather than multiple personalities.   Besides florid and positive symptoms, such as auditory, visual and olfactory hallucinations, defendants suffering from psychosis may suffer from negative symptoms, including formal thought disorders in which the defendant may jump from one topic to another without making much sense, or make up his or her own words or sounds.

The multiple mental deficits experienced by the psychotic defendant impede abstract and practical reasoning.   Even when florid symptoms are not present, mentally ill defendants may not have the capacity, due to the presence of other symptoms, to reason effectively about what moral choices are appropriate.   However, the nature and the persistence of these deficits are not generally appreciated.

Furthermore, there is a misconception that psychosis, unlike mental retardation, can be effective treated in all or most cases, and a related misconception that the effects of treatment is relatively benign.   As a result, mentally ill defendants are mistakenly held responsible for not obtaining treatment and resisting treatment.   In reality, the disease is often refractory to treatment and the sequelia of the medical regime include severely unpleasant symptoms.   In some case, symptoms similar to the shaking observed in turrets syndrome manifest themselves, along with dry mouth and depression.

Both the disease and pharmaceutical treatments for it frequently diminish affective behavior and responses.   The results may be even more dramatic than in the case of retardation. Laypersons, including jurors, may perceive cold heartedness and disinterest when the truth is that the defendant simply does not have the physical capacity to respond emotionally in a usual or normal manner.   Even more devastating to the defense, the negative symptoms of psychosis can

---

[2] See, http://www.ehealthmd.com/library/schizophrenia/SCH_whatis.html

cause terribly inappropriate reactions, such as laughing at events that call for an expression of sorrow or remorse.

Recent advances in psychometric testing and analysis makes it impossible to reasonably distinguish between severed psychosis and mental retardation for eighth amendment purposes. In particular, test have been developed to test specific deficits in cognition, such as the extent to which a psychotic defendant suffers from thought disorders that inhibit practical, and therefore, moral deliberation. Furthermore, it is now becoming clear that many psychoses are developmental diseases, probably with a genetic basis.

Mr. Green appears to suffer from positive and negative symptoms that risk wrongful conviction. Putting him to death will therefore violated the Eighth Amendment just as surely as executing a mentally retarded individual would.

## CLAIM #5

**MR. GREEN'S DUE PROCESS AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED BECAUSE THE CHARGE TO THE JURY DID NOT REQUIRE UNANIMOUS AGREEMENT ON AN AGGRAVATING FELONY.**

The jury instructions at the guilt/innocence phase of the trial directed the jury to convict of capital murder if they believed beyond a reasonable doubt that Appellant intentionally committed murder in the course of either "kidnapping" or "aggravated sexual assault." The jury was not required to unanimously agree on which aggravating element   "kidnapping" or "aggravated sexual assault" would be the basis of the verdict.

This approach of submission of alternative theories in one paragraph was sustained by a plurality opinion in *Schad v. Arizona*, 501 U.S. 624 (1991). Justice Scalia's concurring and deciding vote affirming the conviction was based solely on "the endorsement of history."

The recent case of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) has changed the way the matter should be examined. The aggravating element, whether it be kidnapping or aggravated sexual assault, is an element of the offense that must be determined by the "jury on the basis of proof beyond a reasonable doubt." Thus the aggravating element is just as legally and factually important as the murder.

The significance of an aggravating element that exposes Appellant to the death penalty has been affirmed in the recent case of *Ring v. Arizona*, 536 U.S. 584 (2002). With regard to punishment "Death is different." This is not an issue of manner and means, where the jury is asked to convict of murder by either strangling or suffocating. Arguably Due Process would allow the jury to convict for murder if six felt that a murder was committed by one manner and the other six felt the murder was committed in the other manner. The aggravating element raises the offense from murder to capital murder. Due process of law, the Sixth Amendment, and protection from cruel and unusual punishment under the Eighth Amendment require that the jury unanimously agree in this regard.

## <u>INEFFECTIVENESS OF COUNSEL CLAIMS</u>

*Strickland v. Washington*, 466 U.S. 668 (1984), set forth the legal principles that govern ineffective assistance of counsel claims. There are two components: a petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Id.* at 687. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.*, at 688. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins v. Smith,* 539 U.S. 510, 521 (2003). Instead, the Court has "emphasized that '[t]he proper measure of

attorney performance remains simply reasonableness under prevailing professional norms.'" *Id.,*
(quoting *Strickland*, 466 U.S., at 688).

In order for counsel's inadequate performance to constitute a Sixth Amendment violation,
petitioner must show that counsel's failures prejudiced his defense.  *Strickland*, 466 U.S., at 692.
To establish prejudice, a "defendant must show that there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would have been different.   A
reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.,
at 694.  In assessing prejudice, the reviewing court reweighs the evidence in aggravation against
the totality of available mitigating evidence.  *Wiggins,* 539 U.S. at 534.  The totality of the
evidence includes "both that adduced at trial, and the evidence adduced in the habeas
proceeding[s]." *Williams*, 529 U.S., at 397-398 (emphasis added).

## CLAIM # 6

**TRIAL   COUNSEL   RENDERED   CONSTITUTIONALLY
INEFFECTIVE ASSISTANCE BY NOT MOVING TO QUASH AT
INDICTMENT THAT FAILED TO PROVIDE FAIR NOTICE OF
THE OFFENSE CHARGED.**

The capital murder indictment against Applicant alleged in substance that Applicant,

> On or about June 21,2000, did then and there intentionally cause the death
> of an individual, namely, Christina Neal, by strangling Christina Neal with
> a piece of cloth, and the Defendant was then and there in the course of
> committing or attempting to commit the offense of kidnapping or
> aggravated sexual assault of Christina Neal.

*Clerk's Record, vol.* 1, at 15.

Tex. Penal Code § 19.03(a)(2) provides that a person commits the offense of capital
murder if the person "intentionally commits the murder in the course of attempting to commit
kidnapping [ or] aggravated sexual assault. . .".  Tex. Penal Code § 20.03(a) provides that a

person commits the offense of kidnapping "if he intentionally or knowingly abducts another person." "Abduct" means "to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use deadly force." Tex. Penal Code § 20.01(2). Tex. Penal Code § 22.021(B) provides that a person commits the offense of aggravated sexual assault:

(1) if the person:

* * *

(A) intentionally or knowingly:

(i) causes the penetration of the anus or female sexual organ of another person by any means, without that person's consent,

(ii) causes the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent; or

(iii) causes the sexual organ of another person, without that person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor; or

(B) intentionally or knowingly

(i) causes the penetration of the anus or female sexual organ of a child by any means;

(ii) causes the penetration of the mouth of a child by the sexual organ of the actor;

(iii) causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor;

(iv) causes the anus of the child to' contact the mouth, anus, or sexual organ of another person, including the actor; or

(v) causes the mouth of a child to contact the mouth, anus, or sexual organ of another person, including the actor; and

(2) if:

* * *

(B) the victim is younger than 14 years of age;

Applicant's trial counsel filed a motion to quash the indictment (C.R. 92-93), but that motion alleged only that the indictment "does not set forth the offense in plain and intelligible language," and "is 'catch-all,' alleging two secondary offenses, the sexual assault having no basis in the evidence."  The motion to quash is plainly inadequate on its face to preserve any meaningful or substantial issue for appellate review.  Reasonably effective counsel would have filed a motion to quash the indictment on the grounds that it fails to provide constitutionally adequate notice to the accused.  In violation of his rights under the Fourteenth Amendment to the Constitution of the United States, of the offense with which he is sought to be charged, because the indictment does not allege (with respect to the kidnapping element or component of the offense) which of two different kinds of "abduction" is sought to be alleged and proved, and does not allege (with respect to the aggravated sexual assault element or component of the offense) which of eight different kinds of sexual "penetration" or "contact" is sought to be alleged and proved.

This issue is governed by *Curry v. State*, 30 S.W.3d 394 (Tex. Crim. App. 2000), overruled in part on other grounds, *Gollihar v. State*, 46 S.W.3d 243 (Tex. Crim. App. 2001). The Court in *Curry* expressly reaffirmed its earlier holding in *Gibbons v. State*, 6532 S.W.2d 413, 415 (Tex. Crim. App. 1983), that in an aggravated kidnapping case "the State must allege, in the face of a motion to quash, which type of abduction it seeks to prove."  30 S.W.3d at 401. After exhaustively canvassing the surplusage cases, "[involving] language that is not derived from any statute," the Court in Curry refused "to overrule the exception to the surplusage rule which provides that if a phrase is descriptive of an essential element of the offense, it must be proved and cannot be surplusage," because "the phrase in this case was not merely descriptive of an element of the offense; it was a manner or means of committing an element of the offense" 30

S.W.3d at 401, 403 (emphasis added).  The same principle logically extends to the offense of aggravated sexual assault: there are five different ways to "cause" either "penetration" or "contact."  A timely motion to quash on the basis of *Curry* would have been granted.

Defense counsel's deficiency with respect to the allegation of aggravated sexual assault in the indictment is apparent: the indictment does not allege the age of Christina Neal.  Thus, from the face of the indictment, it is impossible to determine whether the State and grand jury intended to allege a violation of Tex. Penal Code § 22.021(a)(I)(A), or § 22.021(a)(I)(B), or both.  The severe prejudice inevitably resulting from not knowing which statute under which the accused is charged is fundamental.

Trial counsel should have recognized the defects in the indictment in light of *Curry*.  The failure of the indictment specifically to identify the statutory provisions under which Applicant was charged, and to allege factually the kind of "abduction," sexual "penetration," and sexual "contact" the State would seek to prove beyond a" reasonable doubt at trial, fatally infected the fairness of the entire trial, particularly with respect to (i) the sufficiency of the evidence to establish guilt, (ii) the closing arguments to the jury by trial counsel for the State and the defense at the guilt - innocence phase of the trial, and (iii) the trial court's charge to the jury at the guilt - innocence phase (C.R. 2: 250-56).  This is because (1) the defects in the indictment prompted error with respect to the trial court's and counsel's assessment of the constitutional sufficiency of the evidence, which in turn (2) prompted error in the trial court's charge to the jury at the guilt-innocence phase, which in turn (3) virtually assured error in counsel's closing argument to the jury, which in turn (4) foreclosed a unanimous jury finding that each element of the offense charged had been proved beyond a reasonable doubt.

## CLAIM # 7

**TRIAL COUNSEL RENDERED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE BECAUSE HE FAILED TO OBJECT TO CLOSING ARGUMENT THAT THE JURY WAS NOT REQUIRED TO AGREE UNANIMOUSLY ON WHETHER MR. GREEN COMMITTED KIDNAPPING OR AGGRAVATED SEXUAL ASSAULT.**

Every criminal defendant in the United States has a federal constitutional right to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 2000), quoting *United States v. Gaudin*, 515 U.S. 506, 510 (1995).  For the reasons previously stated in the foregoing ground for relief, it cannot be maintained with confidence that this right was accorded to Applicant in this case. Applicant sustained an independent violation of his right to a unanimous jury verdict, based upon proof beyond a reasonable doubt, when the State's attorney made the following assertion, without objection by the defense, during closing argument at the guilt-innocence phase of the trial:

> [The medical examiner] also told us that the bruising was very consistent with the fact that force had to be used. As you go to deliberate, keep in mind, you have to have a unanimous verdict as to guilt. However, as to the underlying felony, you can pick. If some of you agree it's kidnapping, that's okay. If the rest of you agree that it is aggravated sexual assault, that's okay. You don't have to be unanimous on the underlying felony, but I would submit to you that both of them have been proven to you beyond a reasonable doubt. That shouldn't be a problem at all (emphasis added).

"The Supreme Court has held that, when a state guarantees a structural protection, it violates the Due Process Clause of. the federal Constitution if it fails meaningfully to vindicate that guarantee." *Hoover v. Johnson*, 193 F.3d 366, 370 (5th Cir. 1999), citing *Evitts v. Lucy*, 469 U.S. 387, 400-01 (1985) (holding that because a state allowed criminal appeals it was obligated to administer them in a manner consistent with the Fourteenth Amendment's due process clause).

Texas law not only requires a unanimous jury verdict in every case; it requires unanimity with respect to every element of the offense charged, because *Apprendi v. New Jersey* demands that every such element be charged and proved beyond a reasonable doubt.

Here the prosecutor's incorrect and misleading comments, mistakenly asserting that unanimity was not required, could have been immediately corrected with a simple objection and an equally straightforward clarifying instruction by the trial court. The misconception was never correct, and the instruction was never given, because defense counsel failed to object. That failure constituted ineffective assistance of counsel under federal constitutional standards prescribed by *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The error substantially prejudiced Applicant's right to a fair and impartial trial.

## CLAIM # 8

**TRIAL COUNSEL WAS INEFFECTIVE BECAUSE HE FAILED TO IMPEACH EXPERT TESTIMONY USED TO ESTABLISH SEXUAL ASSAULT *VIA* ALLEGED PRESENCE OF GENITAL BRUISING.**

It was not until after trial that defense counsel inquired whether testimony regarding trauma to the victim's genitals could have been impeached and rebutted. Approximately one month after trial, co-counsel inquired of defense expert Dr. Raul Lede if Dr. Carter could have reliably diagnosed a contusion. At this point, co-counsel learned from Dr. Lede that Dr. Carter failed to collect or examine necessary tissue samples. Dr. Lede also pointed out that a reliable diagnosis could not be made because of the advanced state of decomposition. Dr. Lede provided the opinion that the alleged bruises were most likely not bruises but rather discoloration due to decomposition. Dr. Lede was available at trial, but counsel did not elicit this critical information at that time.

Dr. Carter observed what she characterized as a "bruise" on Christina Neal's upper left thigh and another bruise approximately four inches in diameter "just above the public bone area." Tr. Tansc. vol. XVII, at 103.  She testified that there was a third "bruise" "approximately one-quarter inch in dimension. . . beneath the skin near the anus." *Id.* at 104.  Dr. Carter's opinion was that "the bruising on the leg indicates a forceful opening or spreading of the legs and [the bruising on] the abdominal region or just above the pelvic region is consistent with force being applied on that part of the body usually to prevent motion." *Id.* at 105.  Dr. Carter's autopsy report concluded with "changes consistent with probable sexual assault."  *Id.* at 125; *and State's Exh*. 162.

Despite Dr. Carter's testimony concerning the purported "bruising" as evidence of a "probable" sexual assault, defense counsel devoted almost the entirety of cross-examination, *Id.* at 107, to questioning concerning ligature strangulation as the cause of death.  No effort was made to challenge Dr. Carter's findings with respect to the purported sexual assault, and no contrary expert testimony was offered, although a contrary medical opinion could have been offered: the "bruises" were not "bruises" at all, and therefore were no evidence whatever of a sexual assault, but rather the natural consequence of advanced decomposition of the body.

The failure of Applicant's trial counsel to have aggressively questioned Dr. Carter's conclusions relating to the purported significance of the alleged bruises, and the failure to have marshaled expert testimony to refute the supposition that the marks were somehow probative evidence of sexual assault, cannot rationally be characterized as within the zone of reasonable trial strategy.  The State had the burden to prove, beyond a reasonable doubt, that Christina Neal had been kidnapped and sexually assaulted before she was murdered.  Despite the legitimate doubt that might easily have been cast on Dr. Carter's conclusions, trial counsel abdicated their

responsibility to effectively cross-examine the witness, or to offer contradictory evidence, essentially conceding the issue to the State.

Defense counsel therefore failed to provide reasonably effective assistance of counsel under the constitutional standard prescribed by *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

**CLAIM #9**

**IN VIOLATION OF DUE PROCESS, THE STATE SPONSORED FALSE OR MISLEADING TESTIMONY SUPPORTING CONVICTIONS FOR THE AGGRAVATING FELONIES OF RAPE AND KIDNAPPING.**

Facts relevant to Dr. Carter's testimony on aggravated sexual assault stated in claim # 8 are incorporated as if fully set forth herein.

The opinion of Dr. Carter is unsupported by the medical literature.  Indeed, her testimony is based on techniques contrary to what is required for reliable diagnosis of bruising based on pathological examination.  Dr. Carter did not conduct the necessary microscopic examination, or preserve tissues for review by others.

Importantly, the State was aware of the need for these procedures in order to proffer a diagnosis of bruising in a corpse that has been exposed for the lengthy of time as Christina Neal's.  Dr. Carter provided similar testimony regarding vaginal bruising in support of aggravating felony rape in *Swearingen v. State* a capital case tried in the year 2000 in Montgomery County.  In this previous case, too, the time between disappearance and recovery of the victim's body from the woods spanned two weeks.  On cross examination, Dr. Carter conceded that she had not conducted microscopic examinations necessary to diagnose bruising. Subsequently, in 2004, the Harris County Medical Examiner's Office issued a letter opinion that

bruising could not be diagnosed in the *Swearingen* case, which effectively retracted Dr. Carter's

testimony and undermining the State's insistence that bruising was present.

Sponsorship of Dr. Carter's testimony violated *Giglio v. United States*, 405 U.S. 150

(1972).  Relief should be ordered.

## CLAIM #10

**COUNSEL WAS INEFFECTIVE BECAUSE COUNSEL FAILED TO INVESTIGATE IMPORTANT MITIGATING EVIDENCE.**

## CLAIM #11

**TRIAL COUNSEL WAS INEFFECTIVE BECAUSE HE FAILED TO OBJECT TO EVIDENCE THAT APPLICANT HAD REVOKED HIS CONSENT TO SEARCH HIS PROPERTY.**

"The failure to consent to a search cannot form any part of the basis for reasonable

suspicion."  *United States v. Wood*, 106 F.3d 942, 946 (10th Cir.1997).  Asking a jury to draw

adverse inferences from such a refusal is impermissible if the testimony is not admitted as a fair

response to a claim by the defendant or for some other proper purpose.  *See United States v.

Thame*, 846 F.2d 200, 207 (3d Cir.1988*); see also United States v. McNatt*, 931 F.2d 251, 258

(4th Cir.1991).  Texas law makes the same constitutional point. *See Reeves v. State,* 936 S.W.2d

471, 495 (Tex. App. – Waco, 1998, pet. ref'd) ("Admitting evidence of q defendant's refusal to

consent to entry into [his] home without a warrant imposes a penalty for exercising a

constitutional privilege and lessens the privilege by making its assertion costly.").

In opening and closing statements, prosecutors emphasized the fact that Mr. Green had

revoked the consent to search his home and yard:

> So, what happened was - or the evidence will show that on the morning of
> 21 July 2000, almost exactly 30 days after the disappearance of Christina
> Neal agents went to the home of Jonathan Green. Not for the first time. And
> knocked on the door. Said, "Do you mind if we search your property?" I

think the evidence will show that Mr. Green said, "No, but keep it quick and I want to be there." And Special Agent Fox who accompanied Officer Gay said, "Okay, that's what we will do." They went back. They got something called an evidence recovery team, which is a fancy name for a bunch of FBI agents and the FBI agents came onto the property. And when they came onto the property, Mr. Green was indeed there and he did indeed monitor their activities. And one of the agents, Special Agent Mark Young, took out a probe, which I think the evidence will show is just a long metal rod and went to the bum pile where the fire was and Mr. Green says, "You can't dig there." And he said, "Why?" And he said, "You can't dig there and people who do that thing in this part of the county, sometimes there is a tendency for them to get shot and y'all need to get off." And the agents, not being with a search warrant, only having the consent of the defendant, said, fine, we're gone. And they left. And they made arrangements to come back to Montgomery County here -- excuse me -- back to Conroe and get a search warrant to search the property. And they did so.

*Tr. Transc. vol.* XIV, 55-56

Special Agent Young goes to the property. It's a consensual search. Takes out his probe, walks to the burn pile area, puts his probe in and Agent Young came in here and told you it was consistent - the earth had been disturbed in that area. But what's the most important thing that he told you? He smelled decaying flesh. Put the probe in, brought it out, it came out of the ground. Agent Wyckoff told you she smelled that odor. These' are both people that were familiar with that type of odor and they told you that. At this point they bring the shovels. Get the shovels. We're going to dig here. Right here. And what does he do? Get off my property. People like you could get shot doing this. He didn't want them digging in that area. And he didn't want them digging there because he knew what was there because he put it there. He dumped that little girl in his trash pile like she was a piece of trash and that's why he didn't want them to dig in that hole. Because he knew what was there.

*Id. vol* XIX, at 38.

We've started that morning, the defendant saying, yeah, you can look, search the property, probe goes in, probe comes out, odor comes with it, get the shovels. No, get off my property. You can't dig there.

*Id., vol.* XIX, at 41.

And they called in the evidence recovery team, people specially trained in looking for forensic evidence from the Federal Bureau of Investigation. You heard the testimony of Special Agent Young. Everything was fine. It was peachy. It was swell. You can search my house, you can go in the backyard

and you can do what you want. Okay, sir, fine. And the search proceeds. And Agent Young takes a probe and places it in the ground and what happens then? No. You can't dig there. Get off my property. Or as Agent Wyckoff testified to you, Mr. Young (sic) said get the fuck off. My, my. What logical inference can a person draw from that? Where does your common sense tell you that little edict to get off the property is coming from? Why as a logical inference from the evidence would the defendant say you can search anywhere but, oh, not there? Gosh. Because he knew. Because he killed her and he placed her there. What other reason can there be? What else can the evidence possibly show? What facts elicited in this courtroom these last six days show anything but? And what does your common sense tell you? If she wasn't there and he didn't know it, why would he care? Get a backhoe. Get it done, get gone. So, fine. The police, realizing now that perhaps we need to change venue and get out of here, do it immediately. We're gone. The FBI, everybody else. And acting on that information what did they do? They took the proper judicial course of action. They got a search warrant.

*Id., vol.* XIX, at 78-79.

Crime scene investigators also testified that Mr. Green revoked consent to search, compelling them to obtain a warrant.  Trial counsel, failed to object to extensive argument and testimony incriminating Mr. Green for invoking his constitutional rights.

In conjunction with other errors, trial counsel's performance prejudiced Mr. Green.

## PRAYER FOR RELIEF

WHEREFORE, Jonathan Marcus Green requests that this Court:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

2. Grant him an evidentiary hearing at which he may present evidence in support of the foregoing claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of fact and of law raised by this petition or such hearing.

3. Grant undersigned counsel a reasonable period of time, not less than one hundred and eighty (180) days to prepare and file such amendments to this petition as may be necessary to raise all available constitutional challenges to Mr. Green's conviction and death sentence in this proceeding.

4.      Grant such other relief as law and justice require.

                               Respectfully submitted,

                               HILDER & ASSOCIATES, P.C.

                   By:    /s/
                               Philip H. Hilder
                               State Bar No. 19620050
                               James Rytting
                               State Bar No. 24002883
                               819 Lovett Boulevard
                               Houston, Texas 77006
                               Telephone (713) 655-9111
                               Facsimile (713) 655-9112
                               ATTORNEYS FOR PETITIONER

## **VERIFICATION**

      I, James Rytting, state that to the best of my knowledge, the facts alleged in support of the claims in this case are true and correct, under penalty of perjury, as proscribed by Title 18 U.S.C. § 1746; and  I hereby sign on behalf of Petitioner, Jonathan Marcus Green.

                         /s/_____
                             James Rytting

## **CERTIFICATE OF SERVICE**

      On March 6, 2007, a copy of Mr. Swearingen's petition for writ of habeas corpus was served upon Respondent by ECF filing system, and/or U.S. Mail, return receipt requested, addressed to Deni Smith Garcia, Assistant Attorney General, Capital Litigation, P.O. Box 12548, Capitol Station, Austin, Texas 78711.

                        /s/_____
                             James Rytting