UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **JONATHAN MARCUS GREEN,** | § | |
| **Petitioner** | § | |
| | § | |
| **V.** | § | **Civil Action.  4:07-cv-00827.** |
| | § | |
| **RICK THALER, Director,** | § | |
| **Texas Department of Criminal** | § | ***AN EXECUTION DATE IS*** |
| **Justice, Correctional Institutions Division,** | § | ***SCHEDULED FOR APRIL 30,*** |
| **Respondent.** | § | ***2010 IN THIS CASE.*** |

MOTION FOR STAY OF EXECUTION; AND
PETITION FOR WRIT OF HABEAS CORPUS ON THE GROUND THAT
EXECUTING MR. GREEN WILL VIOLATE THE EIGHTH AMENDMENT OF
THE CONSTITUTION

Applicant, Jonathan Marcus Green, respectfully requests that this Court stay his execution and vacate the execution date so that the issue of Mr. Green's Eighth Amendment right against being executed while incompetent can be properly litigated at a *Ford* hearing.  Without a stay the harm to Mr. Green will be irreparable, namely, death; furthermore, he will be unable, after execution, to vindicate fundamental constitutional rights guaranteed by the Eighth and Fourteenth Amendment of the United States Constitution.  As shown below, the evidence of his *Ford* incompetency is more than sufficient to demonstrate that putting him to death will result in a substantial deprivation of his constitutional rights.  As shown, below the timing of this motion is not for delay, but due to decisions of the state courts.

1

## JURISDICTION

This Court had jurisdiction under 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

Mr. Green raised his Eight Amendment claim that he is incompetent to be executed in the petition for a writ of habeas corpus filed in this Court. On February 15, 2008, this Court dismissed the claim **without prejudice** on the ground that it was unripe. USDC, Dkt. [10] (Order) at 26. In doing so, this Court noted that "if execution is not imminent, such a claim is usually dismissed on ripeness grounds, *see Nguyen v. Gibson*, 162 F.3d 600, 602 (10th Cir.1998), subject to being re-urged once an execution date has been set, *see Patterson v. Dretke*, 370 F.3d 480 (5th Cir.), *cert. denied*, 541 U.S. 1058 (2004)." *Id.* at 16.

On May 27, 2010, Mr. Green filed in the 221st District Court of Montgomery County, Texas, a motion pursuant to Article 46.05 of the Texas Code of Criminal Procedures in the 221st District Court for appointment of counsel and expert assistance in order to litigate and exhaust his Eighth Amendment right not to be executed while incompetent. Mr. Green also requested that an evidentiary hearing be set in the event that the expert reports left material questions regarding competency in dispute. On June 6, 2010, the convicting court granted the motion for counsel and expert assistance and ordered psychological reports from Dr. Diane Mosnik and the State's expert, Dr. Mark S. Moeller, due by June 21, 2010.

2

On June 21, 2010, as ordered by the 221st District Court, Dr. Diane Mosnik provided with the results of her psychological assessment of Mr. Green.[1]   After an extensive evaluation of Mr. Green's mental illness and diminished intelligence, Dr. Mosnik concluded that,

> the severity of the mental illness with which Mr. Green suffers prohibits him from having an awareness or understanding of a connection between the crime and its punishment that the punishment imposed cannot serve the purpose for which it was intended.
>
> In regards to Mr. Green"s understanding of his current situation, he does not believe that he is being punished for a crime he committed, or even being punished for anything, but rather is being set up "in the game" so that he will be killed because the warring spirit personalities within him want him to be dead.
>
> In summary, it is the opinion of this examiner that Mr. Jonathan Marcus Green is not competent to be executed. Given the severity of his mental illness and the fixed nature of his delusional belief system, in combination with his history of very limited, if any, treatment for his mental illness, it is questionable whether he will ever respond to antipsychotic medications to the degree to restore his competency.

*Exh.* 'A' ("Forensic Psychological and Clinical Neuropsychological Evaluation").

Dr. Mosnik's findings are corroborated by Mr. Green's recent diagnosis of psychosis and schizophrenia by mental health care workers in the Texas Department of Criminal Justice, *Group Exh.* '*B*' (TDCJ Medical Records), by the testimony of family members and inmates who attest to a ten-year history of bizarre thoughts and behavior.

---

[1] As of the June 23, 2010, motions conference, Dr. Moeller had not provided the convicting court with a copy of his report.  The State, after undersigned counsel requested it, provided a copy of the Moeller report to undersigned counsel on June 22, 2010.

3

*Exh.* 'C' (Affidavit of Tina Green), *Exh.* 'D' (Affidavit of Edwina Taylor), *Exh.* 'E' (Affidavit of James G. Rytting), and by Mr. Green's bizarre written expressions.  Exh. 'F'.

On June 23, 2010, in the 221st District Court of Montgomery County, Mr. Green, moved the 221st District Court for a *Ford* competency hearing, and, pursuant, to Article Tex Code Crim Proc, Art. 43.141, filed a second state application for habeas relief, based on Dr. Mosnik's findings, coupled with a motion to stay and vacate the June 30, 2010, execution date.  Mr. Green argued that a stay was necessary (i) so that he could prepare his expert, develop his claim, and adequately present his incompetency claim, and (ii) so Mr. Green could effectively exercise his right to appeal in to the Texas Court of Criminal Appeals and his right to seek habeas relief in the federal system.

At the June 23, 2010, conference on Mr. Green's motions, the State did not oppose the motion for a hearing, and, in fact, agreed that a hearing was necessary.  However, it opposed the stay of execution on the inexplicable ground that it was "too early" for this motion and based on its assurance that the "Texas Court of Criminal Appeals will stay the execution" anyway.[2]  The 221st District Court granted the motion for a hearing, but denied the motion for a stay and set the *Ford* competency hearing for June 28, 2010, merely two working days after granting the motion.

---

[2] On June 24, 2010, Mr. Green filed the second application for habeas relief and the motion to stay the execution in the Texas Court of Criminal Appeals by overnight mail. The TCCA received the application and motion on June 25, 2010.

4

I.   **EXECUTING MR. GREEN WILL VIOLATE THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION BECAUSE HE IS INCOMPENTEN TO BE EXECUTED UNDER *FORD V. WAINWRIGHT*, 477 U.S. 399 (1986).**

In *Wood* v. *Quarterman*. 572 F.Supp.2d 814, 818 (W.d. Tex. 2008), the federal district court considered the constitutional standard defining incompetency to be executed and the type of showing (or burden on the applicant) that the State could require a defendant to make before he or she was entitled to assistance of counsel and a competency hearing. *Id.,* at 818-819. Turning to the standard first, the *Wood* court explained that the

> Supreme Court's opinion in *Panetti* makes clear a standard for incompetence in this context which focuses exclusively upon the defendant's awareness of his situation but which ignores the possibility the defendant may suffer from delusional thought processes which interfere with his ability to rationally comprehend the causal link between his capital offense and his imminent execution is unconstitutionally narrow. *See Panetti* v. *Quarterman,* --- U.S. at ----, 127 S.Ct. at 2861 ("The potential for a prisoner's recognition of the severity of the offense and the objective of community vindication are called in question, however, if the prisoner's mental state is so distorted by a mental illness that his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole."). "A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Panetti,* --- U.S. at ----,127 S.Ct. at 2862.

Id.

A.   **Current Psychological Records Confirm that Mr. Green Suffers from a Severe Mental Illness that Renders Him Incompetent to Be Executed.**

Mr. Green's medical records show that he recently received a diagnosis from the Texas Department of Criminal Justice's mental health system of a severe mental illness. On February 16, 2010, Correctional Managed Care drafted and "Individualized Treatment Plan for Psychiatry Chronic Care." A chart documenting Mr. Green's mental status, indicated that he "rambles" when speaking, that his concentration and judgment are "diminished", that his insight "poor" and that he experiences visual and auditory hallucinations, which Mr. Green described as "demons" engaged in "spiritual warfare." *Id.* Mental health outpatient records, dated February 13, 2010, resulted in a finding that Mr. Green suffers from "schizophrenia undifferentiated type." *Group Exh. 'B'*.

An interview on January 29, 2010, apparently lead to the diagnosis. The section on "compliance" with medication indicates that TDCJ health care workers had noticed "symptoms of illness" that included auditory, olfactory and somatic delusions. With respect to the latter, Mr. Green reported that his body was moving, his skin was moving and that blood was coming out of his body. During the interview, Mr. Green's thoughts were tangential, and his speech rapid and illogical. *Id.*

The onset of Mr. Green's illness preceded the Axis I diagnoses of psychosis and schizophrenia by several years. TDCJ's correctional managed care reports indicate that Mr. Green's compromised mental status was first observed in June 18, 2007. However, clinical notes and disciplinary reports from the Polunsky Unit reveal signs of mental

6

illness that coincided approximately with his incarceration in 2000 on death row.  In 2003, he was admitted for crisis management administered by the University of Texas Medical Branch because of his bizarre behaviors." *Group Exh. 'B'*.  He was also labeled a suicide precaution at this time. Clinical notes document that in 2003, Mr. Green was "hearing voices [and] feels like he is being hurt."   *Id.*   In an effort to prevent the hallucinations, Mr. Green stuffed toilet paper in his ears, which, on several occasions, required medical intervention in order to remove the impacted tissue from his hears. *Id.* (Clinical Nursing Notes dated 2/19/2005(ultimate page of Group Exh. 'B').

A social history taken on July 20, 2007, disclosed that, as early as July 17, 2002, Mr. Green was hearing "all kinds of funny noises like sex [and] one voice worried about left ear." *Group Exh. 'B'*.  Green apparently went on to describe command hallucinations, i.e., "voices telling him to do stuff," and reported seeing "demons," including seeing "a red skull before coming here." *Id.*  By this early date, Mr. Green had also developed delusions about guards at Polunski being involved in some game that included entities that Mr. Green believed were speaking to him. *Id.*

The Polunski Unit records indicating the onset of severe mental illness approximately ten years ago are corroborated by the reports of family members and fellow inmates.  Tina Green, Mr. Green's youngest sister, noticed that Mr. Green was displaying bizarre behavior and thoughts while incarcerated in the Montgomery County Jail awaiting trial:

7

> After Jonathan was charged with murder, I visited him several times in the Montgomery County Jail. This was the first time that I suspected that he was having serious problems with his mind. The visits went well, in the sense that Jonathan was glad to see me. However, in the middle of the conversation he would start talking about something completely unrelated. I asked Jonathan directly if he was hearing voices and if he was going crazy. Jonathan said that he was hearing voices. He asked me if I could hear "them" too. I asked him who he was talking about since there did not seem to be anyone else around, just Jonathan and myself on the phone in the visitation booth. Jonathan also insisted that my older sister and I were what he called "Sapphires." He made me say that I was one. I tried to move on to something else when Jonathan would start talking in this way.
>
> Jonathan would also show me bruises and cuts on his body. His arms and shoulders were bruised and his wrists were too from the handcuffs. Jonathan showed me a gash on his head as well. However, he did not say how he got these injuries. While we were talking he would just pull up his shirt sleeves or part his hair to show the cut on his scalp and point. I did not ask him what had happened to him.

    *Exh.* 'C'.

Edwina Taylor, Mr. Green's oldest sister, witnessed similarly strange conduct whenever she visited Mr. Green on death row. After Ms. Taylor's latest visits in June of 2010, she reported that,

> Jonathan said it was the people controlling his body that kept him from cutting his hair. He went on to talk about how "they" - that is, the people possessing him, is how I'd put it - were changing his body, changing his face and eyes. He did not say who all these people or things possessing him were, except he called them, or at least one of them, "Sapphire." Jonathan said that Sapphire was inside me too and that Sapphire or "they" had caused me to be sick. Several times during this last visit, Jonathan grabbed his head and grimaced and made noises about whatever it was he thought was inside him and controlling him. When Jonathan said these things, my aunt would tell him to pray and ask the Lord for mercy.

8

*Exh.* 'D'.

Ms. Taylor had similar experiences with her brother during all other visits. As she explained,

> This was not the first time that Jonathan talked about strange things. I have tried to visit Jonathan twice a year since he was convicted. The first time I came to visit he wouldn't come out. However, during all the other visits he mentioned these strange things and complained that he was being controlled and that things or persons were changing his body. It never fails, he would also say that Sapphire or "they" were making me sick and changing my body.

*Exh.* 'D'.

Because Mr. Green was belatedly diagnosed in the Texas Department of Criminal Justice mental health system, his mental illness not been adequately treated.   However, by this time Mr. Green was refractory to the regimen – he refused to comply with directions to take his medication – and to the effects of the pharmaceutics.  As a result his delusional system is fixed and pervades his conception of why he is on death row and why he is being punished. As a result, as Dr. Diane Mosnik found, he does not have a rational understanding of why the State proposes to carry out the death penalty.

**B.      The Evaluation by Neuropsychologist, Diane Mosnik, PhD, of Mr. Green Demonstrates that He is Incompetent to be Executed.**

Dr. Diane Mosnik interviewed and tested Mr. Green over a two day period at the Polunski Unit in Livingston, Texas. *Exh.* 'A'.   According to Dr. Mosnik, "Mr. Green was compliant with the testing procedures despite being distracted by his experience of auditory hallucinations and concerns that he was not performing to the best

9

of his abilities because his thinking abilities were being controlled and blocked by the spirits and "personalities" who were controlling his "physical and mental functioning." *Id.* The tests that Dr. Mosnik administered included the "following battery of standardized tests":

1. Clinical Diagnostic Psychiatric Interview.

2. Scale for the Assessment of Negative Symptoms (SANS) & the Scale for the Assessment of Positive Symptoms (SAPS).

3. Brief Psychiatric Rating Scale (BPRS).

4. Wechsler Adult Intelligence Scale-IV edition.

5. Wide Range Achievement Test-IV edition.

6. Controlled Oral Word Association & Semantic Fluency.

7. Hopkins Verbal Learning Test-Revised, version 5.

8. Brief Visual Spatial Memory Test-Revised, version 1.

9. Trail Making Test A & B.

10. Wisconsin Card Sorting Test.

11. Rey-O Complex Figure copy.

12. Symbol Digit Modalities in written and oral formats.

*Id.*

Dr. Mosnik also conducted an extensive review of Mr. Green's medical and psychiatric records, and reviewed statements from Mr. Green's relatives and attorney.

10

Based on her extensive interview and review of the record, Dr. Mosnik arrived at

the following diagnostic impression:

> Mr. Green exhibited the persistent experience of symptoms
> characteristic of individuals diagnosed with a serious psychotic
> disorder, namely, markedly severe delusions, hallucinations, and
> formal thought disorder that interfere significantly with his overall
> level of functioning and have been present for greater than six
> months.  In regards to his cognitive functioning, he demonstrated
> moderately impaired learning and memory for verbal information,
> attentional impairment, and executive dysfunction characterized by
> impaired problem-solving and mental set shifting; cognitive
> dysfunction consistent with the pattern of cognitive impairments
> typically seen in individuals diagnosed with schizophrenia (Gold &
> Harvey, 1993; O'Carroll, 2000).  Given the pattern and severity of his
> symptomatology, in conjunction with his pattern of cognitive deficits,
> he meets criteria for a diagnosis of Schizophrenia, undifferentiated
> type.  Specifically, he demonstrated auditory hallucinations consisting
> of voices commanding him to engage in certain behaviors and voices
> conversing with each other but allowing him to hear them, somatic /
> tactile and olfactory hallucinations, delusional ideation, paranoia,
> disorganized speech with evidence of formal thought disorder
> (evidenced by illogicality in his spoken and written language), and the
> negative symptoms of loss of affective responsivity, alogia, and poor
> attention.  His overall general intellectual capability fell within the
> borderline range of functioning (SS = 74, 4th percentile, 90th
> percentile range = 71-78), as did his performance on measures of
> academic functioning, including reading, reading comprehension, and
> spelling.  As such, he also meets criteria for a diagnosis of Borderline
> Intellectual Functioning, which is consistent with the poor grades he
> achieved during his formal schooling.

Id.

Turning to the issue of competency to be executed, Dr. Mosnik determined that

Because of the nature and severity of his delusional belief system caused by his mental
illness of schizophrenia, he does not believe that he is responsible for committing a
crime. He believes that he was "set up" and is being put to death for a crime, not because

he committed it, but because the spirit personalities warring within him have been trying to kill him since he was baby. He also reported that these spirit personalities killed his mother and are also responsible for the deaths of others, including one of his attorneys. Mr. Green"s firmly held delusional beliefs are fully intertwined with and alter his understanding of how he came to be on deathrow, why he is being held on deathrow, and why he is being executed. This severely delusional belief system precludes him from having a rational understanding of a connection between his personal conduct and the death penalty that he is awaiting.

Id.

She therefore concluded that "the severity of the mental illness with which Mr. Green suffers prohibits him from having an awareness or understanding of a connection between the crime and its punishment that the punishment imposed [therefore] cannot serve the purpose for which it was intended." *Id.*

## II.  THE EXECUTION OF MR. GREEN MUST BE STAYED AND THE DATE VACATE TO ENSURE HIS RIGHT TO HABEAS CORPUS REVIEW

### A.  Mr. Green is entitled to federal review of his incompetency claim.

Mr. Green is entitled to federal review of his federal constitutional right not be executed while incompetent.  The right to such review is guaranteed by Article I, Section 9 of the United State Constitution and under Title 28 U.S.C. § 2254.  Habeas corpus jurisdiction under §2254 exists not only to remedy custody occasioned by a conviction rendered, or a sentence imposed, in violation of the Constitution, but also to provide relief from an otherwise lawfully imposed sentence when the circumstances of the execution of that sentence give rise to a constitutional violation. *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) (holding that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a

12

determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus"); *see also*, *e.g.*, *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998) (citing *Preiser*) ("we have held that any claim by a prisoner attacking the validity or duration of his confinement must be brought under the habeas sections of Title 28 of the United States Code").

Furthermore, this Court expressly recognized that Mr. Green was entitled to return to federal court after an execution date was set and his *Ford* incompetency claim ripened. However, before he could do so Mr. Green had to exhaust state court remedies. *See,* 28 U.S.C. §2254(d)(1).

In *Barefoot v. Estelle*, the Supreme Court adopted standards for determining whether a petitioner made a substantial showing of a denial of a federal right. 463 U.S. 880, 895 (1983). The criteria straightforwardly apply to  allegation that a prisoner is incompetent to be executed. *See Demosthenes v. Baal*, 495 U.S. 731, 737 (1990). As the *Barefoot* Court stated,

> "In requiring a `question of some substance', or a 'substantial showing of the denial of [a] federal right,' obviously the petitioner need not show that he should prevail on the merits..... Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are 'adequate to deserve encouragement to proceed further.'"

463 U.S., at 893, n. 4. Clearly, given the evidence Mr. Green presents below in this motion to stay and for habeas relief, some reasonable jurist could resolve the issue of Mr.

Green's competency in favor of Mr. Green.   This Court should therefore order Mr. Green's execution stayed.

**B.      Undersigned had diligently pursued state remedies.**

Under Texas Code of Criminal Procedure § 46.05, a defendant must file an incompetency claim 21 days in advance of his execution date in order to be entitled to review by the Texas Court of Criminal Appeals.  Mr. Green filed his incompetency claim by U.S. Mail on May 27, 2010, thirty-four days ahead of the date, and simultaneously moved the 221st District Court for appointment of counsel, expert assistance and a hearing contingent on material issues remaining after the expert's filed their reports.  The State court appointed Dr. Diane Mosnik and ordered reports file with the Court by June 21, 2010.  Dr. Mosnik filed a report on that date.   (As of June 23, 2010, the expert (Dr. Mark S. Moeller) utilized by the State had not provided the Court with a report).

Dr. Mosnik was appointed by this Court on March 27, 2007, to assist undersigned counsel develop claims for inclusion in Mr. Green's original federal petition for habeas corpus.  *USDC, Dkt*. [6] (Order).  As part of the appointment, Dr. Mosnik interviewed Mr. Green at the Polunski Unit.  However, Mr. Green was refractory to testing at that time.[3] This was not willful or strategic ruluctance on Mr. Green's part. Instead, his refusal to complete psychological testing appears to be the result of an exacerbation of his psychotic symptoms during the course of the examination.  Because Dr. Mosnik could

---

[3] Mr. Green's mental health records show that he had a history of being refractory to testing and treatments because of paranoid suspicions that he may be harmed and poisoned by the medicines he needs.

14

not complete testing in 2007, she was unable to make an Axis I diagnosis at that time. Furthermore, Mr. Green's mental health records, up to this point, did not contain a diagnosis of mental illness.

Due to the paucity of mental health information, Mr. Green's *Ford* claim was not only unripe during initial federal habeas proceedings, critical support for it was also not available until 2010, when (i) Dr. Mosnik successfully administered tests to Mr. Green in connection with state proceedings under Article 46.05, and (ii) recent mental health records that undersigned counsel sought to support Mr. Green's *Ford* claim after it ripened revealed that, on February 16, 2010, Mr. Green was finally diagnosed by TDCJ psychiatrists with Schizophrenia undifferentiated type.   Group Exh. 'F'. This diagnosis, furthermore, appears to have been provisional until April 1, 2010, when state clinicians ultimately ruled out malingering, stating "it does not appear that he is exaggerating his symptoms for secondary gain," and ruled out, *inter alia*, intermittent explosive disorder." *Id.* (Bates pages 32-33).

### C.   The State Courts failure to stay the execution is preventing Mr. Green from presenting the kind of record that is necessary for adequate federal review of his claim.

In *Panetti*, the Supreme Court emphasized that Panetti had requested transcripts of proceedings pursuant to Article 46.05, and indicated that the convicting court's failure to order them provided detracted from the adequacy of the proceedings.  *Id.,* 551 U.S., at 938.  As in *Panetti,* the issues raised by Mr. Green's case are clearly the kind that will require careful analysis of the record made at a hearing in order for Mr.   Green to

15

effectively contest on appeal any finding, if such is made, that he is competent to be executed.

Although the convicting court granted undersigned counsel's request for a transcript, failure to stay that execution makes this a moot point. Unless transcripts are provided instanter, the soonest undersigned counsel will be able to review and anlyze the record will be April 29, 2010, one day before the scheduled execution. This Court, furthermore, will not have a record of proceedings until after that time. By statute, and upon motion of any party, the convicting court after a hearing on competency to be executed must send findings of fact and other records necessary for appellate review to the Texas Court of Criminal Appeals. Tex. Code Crim. P. 46.05(*l*). Counsel has filed a motion for transmission of the record, including transcripts of proceedings. Customarily, the Attorney General provides this Court with a copy of the records of state proceedings. Given the circuitous path from the 221st District Court to the TCCA to the AG that he record must traverse before it is file in Federal District Court, Mr. Green will be dead before this Court has before it basic information necessary for its review under the complex standards of the AEDPA.

**D.    A stay is necessary for this Court to review whether the proceedings below complied with due process.**

As the Supreme Court's decisions in *Ford* and *Panetti* made clear, State competency proceedings must comply with due process. In *Ford,* Justice Marshall

underscored a central feature of procedural due process in the context of death penalty cases,

> [C]onsistent with the heightened concern for fairness and accuracy that has characterized our review of the process requisite to the taking of a human life, we believe that any procedure that precludes the prisoner or his counsel from presenting material relevant to his sanity or bars consideration of that material by the factfinder is necessarily inadequate.

Although Justice Powell's suggested in concurrence that states need not surround adjudications of competency with the full panoply of trial rights, he never proposed limits on the defendant's right to present evidence relevant to the issue of competency. Indeed, the core criticism the majority levied against Florida's post-conviction proceeding was that petitioner's did not have the right to present evidence supporting their allegations or impeaching the State's. *Ford*, 477 U.S., at 419.

The 221st District Court's decisions to proceed without a stay and to set a hearing within two working days after the granting the motion for a hearing deprived Mr. Green of his ability to investigate and develop his *Ford* incompetency claim. Pursuant to a discovery motion, the State provided records that Mr. Green was unable to obtain using the authorization for release of medical information that his client provided. The State's production contains important documents in which TDCJ's mental health workers not only diagnose a severe mental illness, but exclude the possibility that Mr. Green is exacerbating his symptoms. Exh. '**'. Another record reveals that one physician ordered important information about Mr. Green's mental status; however, the

unnecessarily rushed schedule imposed by the convicting court prevented counsel from identifying these sources, interviewing these sources, and subpoenaing them to the hearing. Furthermore, the time constraints are exacerbated by the fact that counsel must draft pleadings and litigate issues, such as this motion, simultaneously in the federal system in order to prevent the State from executing his client before this Court can review his case.

## III.   IN MR. GREEN'S CASE, LETHAL INJECTION WOULD BE CRUEL AND UNUSUAL PUNISHMENT.[4]

In *Rupe v. Wood*, 863 F.Supp. 1315 (W.D.Wash. 1994),[5] a federal district court ruled that a "hanging that is likely to result in decapitation constitutes cruel and unusual punishment… and is contrary to "public perception of standards of decency."" *Id.,* at 1321, *Citing, Gregg v. Georgia,* 428 U.S. 153(1976). The district court, therefore, granted relief on Rupe's Eighth Amendment claim upon finding that "there is a significant risk that 'Rupe's hanging will result in decapitation because of his peculiar physical characteristics." *Id.* at 1321.

Texas method of killing people is, of course, different. However, Mr. Green's morbid obesity and mental illness makes lethal injection cruel and unusual and contrary to the public's perception of decency. Green is five feet ten inches (5'10") and presently weighs over 350 pounds. The pattern of fatty deposits in his particular case involves the

_____

[4] Mr. Green included this claim in his second state application for habeas corpus filed in the 221st District Court.

[5] Vacated as moot by *Rupe v. Wood*, 93 F.3d 1434 (9th Cir. 1996), because the State of Washington passed legislation that eliminated hanging as the State's method for lethal injection.

18

upper torso and limbs as much, or more so, than his trunk.  Venous definition at the skin surface cannot be detected.  Furthermore, Mr. Green is also African-American which is an additional hindrance to locating and "sticking" a suitable vein for the injection of legal drugs.  Recent medical records indicate that Mr. Green suffers from **"venous insufficiency."**  Exh. '**'.  The diagnosis first appears in a record dated January 22, 2010, but may explain earlier records recording Mr. Green's complaints about chronic pain in his shoulders and arms and tingling in his hand.

In order to access a venous site, the executioner, in Mr. Green's case, will have to make an incision or "cut-down" in order to locate a vein capable of handling the dosage that Texas administers.  There are several reasons, besides the amount of subcutaneous fat on his limbs, why, in Mr. Green's case, "cutting down" is likely to be a bloody process that will not succeed as planned, making multiple attempts and incisions necessary.  Foremost, is the fact that Mr. Green suffers from a severe mental illness. Among the symptoms are somatic or psychosomatic delusions that specifically involve deluded and hallucinatory thoughts and perceptions about blood, and yellow substances oozing out of his body.  Injecting Mr. Green will undoubtedly greatly exacerbate these symptoms, and an invasive preparatory operation will terrorize Mr. Green out of his mind.  Second, Mr. Green is likely to struggle, jeopardizing the success of the injection and preparatory operations and creating a substantial risk that both steps will be a bloody mess.  Mr. Green's records show that Mr. Green has fought against guards and other

19

inmates on numerous occasions with great force, due to his size and strength and psychologically disturbed state.

## **PRAYER**

Mr. Green respectfully requests that this Court:

1.     Stay his execution;

2.     Order an evidentiary hearing on the Eight Amendment issues raised above;

3.     Grant Mr. Green reasonable time to develop and supplement his incompetency claim with argument and evidence  in the record of proceedings from state court;

4.     Appoint and authorize funding for an investigator so that Mr. Green can interview or depose state mental health care workers who have recently diagnosed Mr. Green with severe mental illness;

5.     Appoint and authorize funding for expert psychological assistance so that Mr. Green can effectively present his Eighth Amendment claims to this Court.

Respectfully submitted,

By:    HILDER & ASSOCIATES, P.C.

819 Lovett Boulevard
Houston, Texas 77006
(713) 655-9111 — Telephone

20

(713) 655-9112 — Facsimile
 _/s/James G. Rytting
Philip H. Hilder
Texas Bar No. 19620050
James Rytting
Texas Bar No. 24002883
ATTORNEYS FOR PETITIONER

## <u>CERTIFICATE OF SERVICE</u>

      I, James Rytting, certify that on June 28, 2010, I electronically filed the foregoing Motion pleading with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system, and that Tomee Morgan Heining was thereby served.

                                       */ s / James G. Rytting*
                                       James G. Rytting

22