**Civil Action  4:07-cv-00827**

# UNITED STATES DISTRICT COURT SOUTHERN DISTRIT OF TEXAS HOUSON DIVISION

———————————————

JONATHAN MARCUS GREEN,
*Petitioner,*
v.
RICK THALER, Director,
Texas Department of Criminal Justice (Institutional Division),
*Respondent.*

———————————————

# MOTION FOR STAY OF EXECUTION

*MR. GREEN IS SCHEDULED TO BE EXECUTED ON OCTOBER 10, 2012*
———————————————————

**Respectfully Submitted,**

By:  **HILDER & ASSOCIATES, P.C.**
819 Lovett Boulevard
Houston, Texas 77006
(713) 655-9111 — Telephone
(713) 655-9112 — Facsimile
_/s/_ *James Rytting*_____
Philip H. Hilder
Texas Bar No. 19620050
James Rytting
Texas Bar No. 24002883

1

TO THE HONORABLE NANCY ATLAS, UNITED STATES DISTRICT JUDGE:

Petitioner, Jonathan Marcus Green, files this motion to vacate his October 10, 2012, execution date, and in support would show as follows:

## I.    JURISDICTION

This Court has jurisdiction under 28 U.S.C. §§ 2241 & 2254.

## II.    INTRODUCTION

In conjunction with this stay motion, Mr. Green is preparing a request for funds, pursuant to 18 U.S.C. § 3599(f), to retain the services of a mental health expert.  Mr. Green seeks funding so that he may have meaningful assistance in developing, preparing, and litigating a claim that he is incompetent to be executed.

Because a *Ford* claim brought when the claim first becomes ripe (i.e., when the execution is imminent) is not second or successive, this Court has jurisdiction to review such a claim. *Panetti v. Quarterman*, 551 U.S. 930, 947 (2007).  Consequently, Mr. Green need not first seek authorization from the Fifth Circuit before filing a Ford claim with this Court. Cf. 28 U.S.C. § 2244(b) (setting out procedures for obtaining permission from the court of appeals to file a second or successive habeas application). In short, Mr. Green is properly before this Court.

The Supreme Court has recognized that the pre-petition appointment of counsel alone – without a stay of execution giving counsel time to adequately develop the facts and brief the claims – renders the statutory guarantee of counsel "an empty promise." *In re Hearn*, 376 F.3d 447, 457 (5th Cir. 2004); see *McFarland v. Scott*, 512 U.S. 849, 858 (1994)(explaining that "the right to counsel necessarily includes a right for that counsel meaningfully to research and present a defendant's habeas claims").  However, a federal court would not abuse its discretion in

denying a stay of execution, "if a dilatory capital defendant inexcusably ignores this opportunity and flouts the available processes." *Id.*

In accordance with the reasoning of *McFarland*, a stay of execution is imperative to ensure the effective development and presentation of Mr. Green's Ford claim to this Court.  Mr. Green has not ignored any opportunity to develop the claim, nor flouted the available  process. This is not a last-minute filing designed to delay the execution: Mr. Green filed his request for a hearing on his *Ford* competency claim in the 221st District Court, Montgomery County, Texas on June 1, 2010, thirty days before his initial execution date and well outside the minimum time frame that State law requires.  *See* TEX. CODE CRIM. P. § 46.05(l).  June 27, 2012, the TCCA, although upholding the convicting court's competency ruling, recognized that Mr. Green timely filed his 2010 action.  *State v. Green* -- S.W.3d ----, 2012 WL 240065, *4 (Tex. Crim. App. 2012) ("Green timely filed his motion to have competency determined under the statute—that is to say, he filed it sufficiently early that this Court is not foreclosed from reviewing the trial court's ruling thereon.").

Nor has Mr. Green been dilatory in returning to federal court to seek habeas review. The convicting court did not set an execution date until August 14, 2012.  The State mailed the notice two days later.  As a result, undersigned counsel received the notice on August 20, 2012.[1]  Mr. Green filed objections to the State's motion to set an execution date for October 10, 2012, and brought to the convicting court's attention the need to obtain records and reevaluate Mr. Green because of the passage of time and changed conditions.  Both the State and Mr. Green had recommended convening a hearing to hear arguments regarding the timing of the execution.  In addition, Mr. Green filed a motion for rehearing of the TCCA's June 27, 2012, decision to deny

---

[1] Undersigned counsel was in the middle of preparing for a civil trial set for September 17, 2012, which he had to move to continue, and preparing a petition for writ of certiorari, due September 25, 2012, in another death sentenced client, Jamie Bruce McCoskey's, case.

relief. In the motion for rehearing he specifically raised the question of whether the trial court had jurisdiction to take any action on Mr. Green's case while the motion for rehearing was pending. However, the convicting court set the second execution date for October 10, 2012, without convening a hearing to consider objections to the timing of the setting.

## III.    PROCEDURAL HISTORY

On July 15, 2002, Mr. Green was convicted of the capital murder of Christina Neal in the 221st District Court of Montgomery County, Texas.[2]  On July 17, 2002, jurors returned special issues resulting in a final judgment imposing the death penalty.  On December 1, 2004, in *Green v. State*, No. 74,398 (Tex. Crim. App.), relief was denied on direct appeal by the Texas Court of Criminal Appeals sitting en banc.  On June 11, 2004, Mr. Green filed a state application for a writ of habeas corpus.  On March 23, 2005, the Texas Court of Criminal Appeals denied post conviction relief in *Ex Parte Green* (WR-61, 225-01).  On March 21, 2006, the Supreme Court of the United States denied Mr. Green's Petition for Writ of Certiorari taken from the denial of his direct appeal.

On March 6, 2007, Mr. Green filed a federal petition for writ of habeas corpus in the United States District Court for the Southern District of Texas.  *Green v. Quarterman,* 4:07-CV-827 (S.D. Tex. 2008).  Mr. Green's federal petition raised 11 claims, including claims that he was incompetent to be executed (claim one) and mentally retarded (claim two).  On February 15, 2008, the federal district court denied relief and a certificate of appealability an all claims except Mr. Green's competency to be executed claim, which the Court dismissed as unripe.[3]  On June

---

[2] Mr. Green was convicted of causing the death of Christina Neal while in the course of kidnapping and/or aggravated sexual assault.

[3] Mr. Green raised a *Ford* incompetency claim in federal proceedings because, at the time, the question of whether a petitioner had to raise the issue in an initial federal petition in order to preserve it even though an execution date had not been set.  A determination regarding Mr. Green's competency to be executed has not been made by a federal court.

16, 2008, Mr. Green filed for a certificate of appealability.  On March 2, 2009, his request for COA was denied.  On October 5, 2009, the United States Supreme Court denied certiorari.

On December 15, 2009, the 221st District Court (convicting court) signed the death warrant and ordered an execution date of June 30, 2010, set.  On June 1, 2010, Mr. Green filed a motion seeking appointment of counsel, funding to retain a mental health expert, and for an evidentiary hearing.  On June 1, 2010, the convicting court granted the motion, appointed undersigned counsel, approved funding for Mr. Green to retain neuro-psychologist Diane Mosnik and appointed Dr. Mark S. Moeller to assist the state.  However, the convicting court held off ruling on Mr. Green's motion for an evidentiary hearing, pending the results of the expert reports.

On June 21, 2010, the experts produced their respective reports each coming to different conclusions about the nature and severity of Mr. Green's mental illness and his capacity to comprehend the nature of his punishment and the reason for inflicting it. *Exh. 'A'* (Report of Diane Mosnik, PhD; Filed Under Seal); *Exh. 'B'* (Report of Mark Moeller, M.D.; Filed Under Seal).  On Wednesday, June 23, 2010, undersigned counsel appeared before the 221st District Court to schedule an evidentiary hearing. Because the execution date was only seven days later, Mr. Green filed his Second Application for Writ of Habeas Corpus Pursuant to 11.071 § 5 of the Texas Code of Criminal Procedures, and filed a Motion for Stay of Execution and to Vacate the Execution Date.  Also on June 23, 2010, the State disclosed medical records which had not been produced by TDCJ in response to Mr. Green's letter dated May 20, 2010, requesting his medical records. *Exh. 'C'* at 4 (Jester IV records; Filed Under Seal).  On June 23, 2010, the convicting court heard the motion for an evidentiary hearing and Mr. Green's motion for a stay of execution, which Mr. Green requested so that the parties could prepare for and litigate issues at

an evidentiary hearing.  *Tranc., June 23, 2010 Hearing* on MOTION FOR ISSUANCE OF SUBPOENAS, CONTINUANCE OF THE   EVIDENTIARY HEARING, and STAY OF EXECUTION, at 6.  The convicting court refused to modify the execution date, and set the evidentiary hearing for Monday, June 28, 2010, two working days later.

On June 28, 2010, a hearing took place in the 221st District Court.  Mr. Green objected on due process grounds that a continuance was needed because he had inadequate time to summon important witness recently discovered in the documents disclosed by the State on June 23rd and because the June 28th date would not allow reasonable time to appeal an adverse decision to the Texas Court of Criminal Appeals ("TCCA") or to litigate Section 2254 issues arising from the competency hearing in federal District Court. *Transc., June 28, 2010, Evidentiary Hearing,* at 5-8.  The convicting court overruled the objections and proceeded with the hearing. *Id.*  At the close of the June 28, 2010 hearing, Judge Michalk issued a ruling from the bench finding Mr. Green competent to be executed, ordered transcripts produced overnight, dismissed the parties and apparently concluded the proceedings. *Id.* at 164-168.  However, right after the parties left the courthouse, Judge Michalk telephoned the District Attorney's office to solicit a proposed order. The Assistant District Attorney in charge of presenting the State's case immediately drafted the requested document. *See Transc., June 12, 2010, Hearing on Motion to Recuse*, at 13, 28.

Despite the compressed time frame, the District Court did not craft a simple order finding Mr. Green competent.  *Exh. 'D'* (*Ex parte* Proposed Order signed by the convicting court). Instead, the State used the occasion to pronounce upon the merits of Mr. Green's earlier pleadings and to sow the record with rather extensive "findings." *Id.*  Although Judge Michalk had not commented on the credibility of the witnesses in her ruling from the bench, the State

made credibility, including remarks on Mr. Green's expert's demeanor, central to the proposed order's rationale for denying Mr. Green's Eighth Amendment claim. *Id.* at 2-3. The District Attorney's Office then hand delivered a copy of the proposed order to the convicting court right before 5:00 PM, June 28, 2010, and orally moved the court order the file transferred immediately to the TCCA. *Exh. 'E'* (State's Motion for Immediate Forwarding of All Appropriate Documents). The convicting court immediately signed the the State's version of the facts and law, apparently called the Clerk with instructions to forward the case.

However, on June 30, 2010, the TCCA stayed the execution. *Exh. 'F'*. The TCCA instructed Mr. Green and the State to file additional briefing regarding whether a *Ford* competency claim could be brought under Article 11.071 or whether Article 46.05 was the exclusive vehicle. *Exh. 'F'*. And the TCCA ordered Judge Michalk to "clarify" her June 28, 2010 ruling because the TCCA could not tell what standards Judge Michalk had relied on in making her determination that Mr. Green was competent to be executed and many of the standards she referred to were incorrect. *Exh. 'G'*.

On July 2, 2010, upon learning that Judge Michalk had solicited a proposed order from the state after she had declared competency proceedings closed, Mr. Green filed a recusal motion under Rule l8a of the Texas Rules of Civil Procedure.[4] On July 8, 2010, Second Administrative Judicial District Judge, Olen Underwood, ordered a hearing on motion for July 12, 2010. At the hearing, Mr. Green's counsel requested a continuance so he could subpoena Judge Michalk. *Transc., July 12, 2010, Hearing on Motion to Recuse* at 1, 6-9. However, after forwarding the

---

[4] Recusals in Texas criminal cases are governed by Texas Rule of Civil Procedure l8a. *See Arnold v. State,* 853 S.W.2d 543, 544 (Tex.Crim.App. 1993).

recusal motion for Judge Underwood to schedule a hearing, the judge left the district.[5] *Id.* at 6. Nonetheless, Judge Underwood denied the continuance and denied the recusal motion.

On July 14, 2010, the trial judge filed a clarification in which she stated that she had just "mentioned the other sections and standards" that were inapplicable to the issue before her "in part to let Applicant's attorney know that she had reviewed his motion and the case at length." *Ex parte Green,* AP-76,374, *[Trial] Court's Written Clarification to Order of Court of Criminal Appeals*, p. 1. However, it is not clear that the "clarification" was included in the record. There is no entry for the "clarification" on the TCCA's internet docket site and the TCCA does not refer to the "clarification" in subsequent opinions on the Mr. Green's case.

Two years later, on June 27, 2012, the TCCA consolidated Mr. Green's Article 11.071, Article 46.05 and Rule 18a cases and issued an opinion affirming the convicting court's competency determination, declaring the 11.071 application unauthorized because Article 46.05 was the exclusive vehicle for raising *Ford* competency, and finding the recusal motion improperly raised, but cognizable in an original habeas proceeding. *State v. Green* -- S.W.3d ----, 2012 WL 240065 (Tex. Crim. App. 2012). In doing so, the TCCA, for the first time, treated issues arising from competency proceedings as direct appellate issues. In a concurrence joined by Judges Alcala and Johnson, Judge Price stressed that "[f]ew cases we have seen this term match the importance of these consolidated cases, which call upon us to decide how the Texas Legislature intended that the Eighth Amendment issue of the competency of a condemned inmate to be executed should properly be determined." *Id.* at *9. However, instead of settling the law, Judge Price feared that "[i]n its opinion today, … the Court has inadvertently thwarted the legislative intent, essentially making law rather than accurately construing it," *id.*, and he called

---

[5]   Undersigned counsel asked the court coordinator of the 221st District Court to where the Judge had absented herself and was told she had gone to Colorado, but planned to return on July 13, 2010; that is the day after the recusal hearing.

for the Texas Legislature "to amend the statute in such a way as to make what was its original intent unmistakable." *Id.*

## III.   LEGAL ARGUMENT

Justice Powell's opinion in *Ford v. Wainwright*, 477 U.S. 399 (1986), states the minimal constitutional standards that state courts must follow when determining whether a defendant is competent to be executed.  Once a prisoner seeking a stay of execution has made "a substantial threshold showing of insanity," the protection afforded by procedural due process includes a "fair hearing" in accord with fundamental fairness. *Ford*, 477 U.S., at 426, 424 (opinion concurring in part and concurring in judgment) (internal quotation marks omitted).  Although, Justice Powell did not set forth "the precise limits that due process imposes in this area." *Id.* at 427, he observed that a State "should have substantial leeway to determine what process best balances the various interests at stake," but only after it has met the "basic requirements" required by due process. *See Panetti* 551 U.S. at 949-950 (quoting *Ford*, 477 U.S. at 427).  These basic requirements include an opportunity to submit "evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination." *Id.*

Mr. Green was therefore entitled to these due process protections once he had made a "substantial threshold showing of insanity." *Id.* at 426.  He made this showing when he filed his June 1, 2010, MOTION FOR APPOINTMENT OF COUNSEL, PSYCHIATRIC ASSISTANCE AND A HEARING PURSUANT TO TEXAS CODE OF CRIMINAL PROCEDURE, ART. 46.05.  This was confirmed by the trial court's appointment on June 4, 2010, of mental health experts pursuant to Article 46.05(f), and by the convicting court's decision to hear testimony at the June 28, 2010, evidentiary hearing.  The TCCA's June 27, 2012, opinion also presumes that

the convicting court found that Mr. Green had made the threshold showing entitling him to appointment of experts and an evidentiary hearing. *See Green* -- S.W.3d ----, 2012 WL 240065, at *13 n. 27 (Price, J., concurring).

**A.   MR. GREEN WAS NOT AFFORDED DUE PROCESS REQUIRED BY SUPREME PRECEDENTS.**

**1.   State court failed to provide adequate notice of or time to prepare for the evidentiary hearing in violation of Mr. Green's right to due process.**

In *Panetti*, the Supreme Court criticized state court proceedings for not providing Panetti with adequate notice of the evidentiary hearing.  In considering what "leeway" to afford the State, the Supreme Court took into consideration that the convicting court hindered Panetti by "provid[ing] at least one significant update to the State without providing the same notice to petitioner, and fail[ing] in general to keep petitioner informed as to the opportunity, if any, he would have to present his case. *Panetti,* 551 U.S. 950.  As stated in *Hall v. Quarterman*, 534 F.3d 365 (5th Cir. 2008) (Higgenbotham, J, concurring in part and dissenting on other grounds), "despite the deference … giv[en] the adjudication of state courts under AEDPA, this court has highlighted—post-AEDPA—that " '[t]he fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner".' *Id.* at 380 (citing, *Fahle v. Cornyn*, 231 F.3d 193, 196 (5th Cir. 2000) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

In Mr. Green's case, the convicting court's conduct was unfair and obstructive.  Although aware that Mr. Green's expert was out of state, with a neuropsychology practice in Wisconsin, and aware that Mr. Green's counsel would have to prepare his expert, review the defense experts report and information on which it was based, and investigate the State's experts background and credential, the convicting court scheduled a hearing with only two working days' notice so as to

ensure Mr. Green could be executed *per* the June 30, 2010, date for lethal injection.

Underscoring the how unnecessary the time frame was is the fact that on June 23, 2010, Mr.

Green and the State both agreed that an evidentiary hearing should be held as follows:

> THE COURT:  Okay.  So I guess my question  is,
> where are we at now?  Are you wanting an evidentiary
> hearing or are you wanting to file a successive writ?
>
> MR. RYTTING:  We filed a successive writ,
> but we are seeking a court's hearing -- an evidentiary
> hearing, a hearing on competency.  And I think at this
> point we have two conflicting expert reports, and an
> evidentiary hearing is the way to resolve it.  I think
> the State agrees this is the way to resolve it.
>
> MR. BRUMBERGER:  Yes, the State would
> agree that the Court would probably like to hear from
> the two experts in person to decide which way the Court
> is going to go.

*Tranc., June 23, 2010, Hearing* on MOTION FOR ISSUANCE OF SUBPOENAS,
CONTINUANCE OF THE EVIDENTIARY HEARING, and STAY OF EXECUTION, at 6.

Mr. Green also drew the convicting court's attention to the welter of appellate and post

conviction proceedings he would have to prepare for and navigate within the space of two days

unless a continuance were granted and a reasonable schedule set.  However, the convicting court

ignored the obstacles to effective representation that forcing a hearing before in between June 23,

2010, and the execution date would create.

> MR. RYTTING:  We have several motions
> here this morning that we'd like to have heard that we
> filed already that I think the Court should take into
> consideration when making its decision.  For example, we
> have -- here's the motion for transmission of the
> records, it's fairly simple.  We would like, of course,
> the hearing transcribed and, of course, there is some
> authority, some Supreme Court authority that access to
> transcriptions of an evidentiary hearing is part of the
> defendant's due process rights, at least the court in
> Connecticut (*sic.*) took that into consideration.  So, if

there's going to be any litigation -- any reasonable
litigation about whether we met the standard, we would
need a transcription instanter.  I just don't see how we
can possibly do it.

MR. BRUMBERGER:  Again, the State agrees
with all that.  It's just a matter of should that be
done right now or should the Court of Criminal Appeals
order the stay for their consideration of the subsequent
writ and any appeal to which he would be entitled.  The
State doesn't disagree with that.  In other words, there
will ultimately be a stay.

MR. RYTTING:  Well, if there's ultimately
going to be a stay, we should do it right now.
Otherwise, we're faced with pellmell litigation up to
the Texas Court of Criminal Appeals.  So, basically the
same night trying to get things filed, trying to get
experts down here, Diane Mosnik will have to come down
from Wisconsin where she has her practice, and she will
have to drop the schedule for Monday.  That's about the
soonest that I could see this possibly happening and
coming down.

*Id.*

The convicting court, moreover, apparently accepted the state's bizarre representation

that because the TCCA would grant a stay under these circumstances that excused the convicting

court from having to modify the execution date so that Mr. Green, who had yet to be adjudicated

competent, had an opportunity to effectively litigate his Eighth Amendment claim at the hearing,

in the TCCA and through federal channels.

THE COURT:  I don't think we have any
trials on Monday.  So I -- I have of a mind to set it on
Monday.  Let's go ahead and get it re-set for Sidney on
Monday.

*Id.*

At the beginning of the June 28, 2010, evidentiary hearing, Mr. Green again objected to

the compressed time frame and to the severe limitations placed on his ability to present evidence

at the evidentiary hearing and on his ability to present claims in appellate and post-conviction

proceedings in the state and federal system:

> On June 23rd, this court heard our motion
> to set a hearing.  When we asked for appointment of
> Diane Mosnik and when we asked for expert assistance, we
> asked for appointment of counsel, appointment of an
> expert under Article 46.05, and we also requested an
> evidentiary hearing contingent upon whether the experts
> returned reports that showed that there was a dispute
> that needed to be resolved . And on June 23rd, it was
> And on June 23rd, it was determined that, yes, and agreed
> to by the state, that there were issues that needed to be resolved.
> The problem we have is that it was only two working days
> before this hearing was ordered convened. From the 23rd,
> it was -- that was a Wednesday, I believe. It went 24th,
> 25th was Friday, and then today we're in court

> ***

> And I'd like to emphasize, too, that
> without a continuance of the -- a stay of this
> execution, the -- not only is Mr. Green going to be
> deprived of his ability to put on evidence about his
> competency to be executed in this court, his ability to
> appeal it is going to be severely curtailed and so will
> his ability to proceed in Federal court. Judge Nancy
> Atlas specifically dismissed the forward claim without
> prejudice so that it could be reurged after we've
> exhausted State remedies. And he is entitled under
> … 28 US 2254 to litigate serious constitutional claims
> like this one in the Federal system.
>         Besides having to prepare for this
> hearing, Judge , I've had to draft documents for filing
> in the Texas Court of criminal Appeals and in the
> Federal District Court in case there ' s an adverse ruling
> to my client. I've had to do this in two working days
> with a caseload that I already had and commitments to
> other clients that I already have. I have not been able
> to meet with Mr. Green about these proceedings.
> so on all those grounds, I think that this rush through a hearing
>  … has deprived him of due process in these
> proceedings and due process in appellant (*sic.*, "appellate")
> proceedings and in his ability to effectively present
> a 2254 motion in Federal court.

*Id.* at 8-11.

Mr. Green again pointed out that the opposition to a stay of execution was "incomprehensible given the state's representations on June 23, 2010, that the Texas Court of criminal Appeals, and I will quote, will stay the execution.  The state said that several times. That seems to be an absolute - - I don't see how you can say that and then argue that there's -- the stay is not needed or it's meritless." *Id.*  Nonetheless, the State re-urged, in different form, the argument that the trial court should just leave matters up to the TCCA.

> MR. BRUMBERGER : The State's point on that date that date was that if the Court of Criminal Appeals is not going to have the record from this case to review,the 're going to stay it. There is no question about that.  Of course, if they do have the record to review, wouldn' t have to. It all depends on what they have to review at the time they receive it.

*Id.* at 11

The convicting court, again, refused to make an independent decision, based on Mr. Green's due process rights, to stay the execution and continue the evidentiary hearing.

Mr. Green was not given adequate notice required for any hearing, let alone an evidentiary hearing involving expert witnesses in a capital case.  For this reason, and those supported below, the leeway that Justice Powell declared federal courts will give to states to fashion the process for adjudicating *Ford* competency claims is not warranted.

### 2.    In violation of Fourteenth Amendment rights to Due Process, the State court prevented Mr. Green from calling witnesses in his favor.

After a prisoner has made the requisite threshold showing, *Ford* requires, at a minimum, that a court allow a prisoner's counsel the opportunity to make an adequate response to evidence solicited by the state court. *See* 477 U.S. at 424.  This means an opportunity to submit psychiatric

evidence as a counterweight to the report filed by the court-appointed experts. *Id*. at 424. Where the outcome of proceedings, as here, may depend on the trier of facts assessment of the parties' respective expert witnesses, denying a petitioner the opportunity to call independent witnesses whose findings support petitioner's expert's position violates minimal due process standards. U.S. CONST. XIV. However, the trial court refused to grant a continuance necessary for Mr. Green to summon mental health experts employed by the State, then signed off on credibility findings solicited *ex parte* and manufactured by the state that proved to be decisive.

During Mr. Green's initial federal habeas proceeding in 2007, Mr. Green obtained medical and psychological records from the Texas Department of Criminal Justice for review by his federally appointed psychological expert. On May 20, 2010, Mr. Green sought current documents related to Mr. Green's mental health from TDCJ and from the University of Texas Medical Branch which is responsible for medical and mental health care in the Texas prison system for inclusion in a petition for clemency and to support his *Ford* claim. On June 23, 2010, the State disclosed additional records it had obtained from TDCJ. These records included psychiatric reports from TDCJ's Jester IV Unit to which Mr. Green had been recently admitted and treated for mental illness. *Exh. 'C'*.

The records obtained by the State identified numerous witnesses who had developed and analyzed evidence highly relevant to Mr. Green's allegation that his underlying psychosis prevented him from having a rational understanding of why he was being executed. The additional records received on June 23, 2010, revealed that Mr. Green had been seen and his test results assessed by a team of mental health workers, including psychiatrists, psychologists and counselors, at Jester IV between February and April of 2010. At the start of the evidentiary

hearing, Mr. Green therefore moved the court for a continuance so he could subpoena these important witnesses.

> 12 One of the things that Mr. Brumberger did
> 13 immediately on June 23rd was disclose documents
> 14 that he had obtained. And review of those records show
> 15 some very important information, including an extensive
> 16 test, personality Inventory Assessment, which is a
> 17 long --
> 18 THE COURT: was it an MMPI?
> 19 MR. RYTTING: PIA .
> 20 Based on which, there's a conclusion that
> 21 Mr. Green not only suffers from schizophrenia; but he's
> 22 not malingering his symptoms. And it would be important
> 23 to have the experts that came to those conclusions --
> 24 first, it's important for counsel to be able to contact
> 25 them and then summon them to a hearing. They clearly
> 1 have highly relevant information to the question of
> 2 competency in this case. There was also produced a
> 3 mental health psychosocial evaluation which summarizes
> 4 the results of the PIA and provides other useful
> 5 information to Mr . Green's case, including a diagnosis
> 6 of schizophrenia-undifferentiated type based not on a
> 7 element (*sic*) interview, but obviously from a -- the results
> 8 of a mental health team who looked at Mr. -- who
> 9 reviewed Mr. Green's case and reviewed 9 his mental status
> 10 at the Jester IV unit.
> 11 So I think not only is it relevant, it' s
> 12 essential for understanding of his mental status for
> 13 proof that we have - - for us to meet your burden of
> 14 proof for competency to be executed in this case.
> 9 reviewed Mr. Green's case and reviewed his mental status
> 10 at the Jester IV unit.
> 11 So I think not only is it relevant , it' s
> 12 essential for understanding of his mental status for
> 13 proof that we have - - for us to meet your burden of
> 14 proof for competency to be executed in this case.

*Transc, June 28, 2010, Evidentiary Hearing* at 5-7.

Mr. Green pointed out that *Ford* competency determinations are governed by federal constitutional standards, as follows:

16

19 …………………………………[T]his is a
20 Constitutional issue. And whether -- and the due
21 process protections of Mr. Green is entitled to are
22 guaranteed by Supreme Court law even if they are not
23 explicitly spelled out in 46.05.

*Id.* at 11.

However, the State opposed the motion for a continuance and request to subpoena witnesses, first, because the Jester IV medical records (two hundred and thirty-three pages total) were supposedly "not particularly long," *id.;* secondly because, in the State's opinion, Mr. Green's "current expert should have had enough opportunity to look at this and be able to testify to her thoughts on it," so there was no need to summons the specialists who examined, treated, and tested Mr. Green; and third, because, in the State's view, "[t]he defendant is not actually entitled under 46,.05 just to have an open evidentiary hearing where numerous mental health experts are brought in. That's not specifically provided under 46.05." *Id.* at 10. The convicting court apparently agreed with the State's interpretation of 46.05 and overruled Mr. Green once again. *Id.* at 12-13.

The Jester IV document show why failure to grant a stay and continuance deprived Mr. Green of due process rights to put on evidence that supported his *Ford* incompetence claim. The constitutional violation, moreover, is perspicuous in light of (i) the state's expert's testimony that Mr. Green did not suffer from schizophrenia and was exaggerating his symptoms, (ii) the convicting court's solicitation and adoption *verbatim* of credibility findings drafted by the state favoring its expert witness, and (iii) the TCCA's decision to review the convicting court's decision under highly deferential appellate standards without providing Mr. Green any of the customary avenues that appellants have for making and briefing objections to the lower court's rulings and conduct.

       **a.**    **The State court unconstitutionally limited Mr. Green's right to sponsor evidence of incompetency and rebut the State's expert's findings.**

The State's expert, Dr. Mark Moeller, did not test for mental illness and he did not test for malingering of symptoms. *Id.* at 128.   Moeller did not administer any tests.   Moeller interviewed Green twice and produced a four page document. *!  At the hearing he maintained that he interviewed Green a total of two hours.   *Id.*   It took him about an hour to compose his report.   Moeller maintained, however, that he did not bill all the time he spent thinking about the case,

> Q And when you were thinking about this case,
> where were you? In the library? At the computer?
> A Different places.
> Q walking around?
> A Yes.
> Q oh, okay. But you weren't assessing -- you
> were analyzing test results?
> A No, I was not.

*Id.* at 119.

However, he did bill for all the time he spent driving to and from Polunsky, six hours total at $350.00 an hour.

Based on interviews conducted on June 16 and 18, 2010, Moeller thought Mr. Green "likely has intermittent hallucinations and disorganized behaviors." *Exh. 'B'* at 4.   However, in Moeller's opinion it was "unlikely that [Mr. Green] is suffering from schizophrenia," because Mr. Green did "not exhibit consistent and progressive thought disorganization or negative symptoms, such as alogia or avolition." *Id.*   Moeller did not mention malingering or exaggeration of symptom in his court ordered report.

At the June 28, 2010, hearing, Moeller refused to modify his opinion that Mr. Green did not suffer from schizophrenia.   Consistent with his report, Moeller continued to maintain that

Mr. Green simply had intermittent psychotic episodes and he maintained that their severity was not extreme, and that they were not consistent over time.  However, at the hearing, Moeller revealed for the first time that he had found that Green was magnifying his symptoms of mental illness for secondary gain. *Transc., June 28, 2010, Evidentiary Hearing*, at 102.  Furthermore, this was critical to his opinion that Mr. Green was competent to be executed.  According to Moeller, "the primary thing" was a "discrepancy on -- between what is stated as far as the severity and magnitude and consistency of his psychotic symptoms … and has this level of function, which is actually pretty good." *Id.* at 102-103.  Moeller maintained that Mr. Green's talk of "spiritual warfare" may have been the product of "symptom magnifying." *Id.* at 128.  Undersigned counsel stressed on cross that Moeller had concluded Mr. Green was malingering based on commissary notes and a letter that Green purportedly wrote to the Montgomery County District Attorney while, in contrast, Dr. Diane Mosnik and Jester IV specialists had utilized objective tests.  Dr. Moeller discounted the testing that Dr. Mosnik gave because it did not have a separate component devoted to the assessment of malingering.  He also maintained that the tests given by Jester IV mental health experts were not reliable indicators of malingering because, according to Moeller, they were not normed on prison populations, which he said cast a bad light on the validity of the tests. *Id.* at 106-107.

Jester IV documents identified a dozen expert witnesses who had administered and analyzed  tests, who had interviewed and evaluated Mr. Green, and who had produced mental health reports containing efforts supporting Dr. Mosnik's diagnosis and conclusions while rebutting Moeller. These witnesses included Janet Ditsky, MS, LPA, MHC, Phyllis Eaton, CCA, Roxsandara Barrientos, CCA, Li-Yun Chuo, M.D., Jamal Rafique, M.D.,  *Exh. 'A'.* at 000033, Leslie C. Morey, PhD, David Estes, PhD, Alan Zond, D.O., and Michael Chancellor, R.MA.,

LPC. *Id.* at 000076.   This team of Jester IV specialists arrived at a definitive diagnosis of Schizophrenia, Undifferentiated Type. *Id.* at 000029 (stating the mental illness was "first observed on February 2, 2010).

The Jester IV diagnosticians reported florid exacerbations of Green's psychotic condition that Moeller had attempted to downplay and discount as symptom magnification. *See, generally Exh. 'C'.* According to the Jester IV personnel, Mr. Green, "complained of auditory hallucinations, which consisted of male and female voices, "making animal sounds, which he stated he hears "right now." *Id.* at 000031.  Mr. Green also "complained of visual hallucinations of visions on the walls," and exhibited formal thought disorders.  According to the Jester IV specialists, Mr. Green also exhibited formal thought disorders.  His "calculations skills were limited, … [and] abstract reasoning poor in that it was extremely concrete," *id.,* and Mr. Green also had "limited insight into his mental condition," *Id.*

The Jester IV team also documented hallucinations and fixed delusional beliefs independently witnessed by Mr. Green's family members, undersigned counsel and defense expert.  According to records signed off by David Estes, PhD, Alan Zond, D.O., and Michael Chancellor, R.MA., LPC, on March 26, 2010 and April 1, 2010, Mr. Green said "he was continuing to have "spiritual warfare," and asked "why do they make my hand hit my face?"  He complained generally that "some things are trying to control my body" and stated specifically that 'principalities and powers of darkness' are trying to control his body." *Id.* 000076.

TDCJ mental health experts also could have testified that they arrived that the diagnosis of Mr. Green's Axis I disorder pursuant to the administration of a several objective tests. According to the investigators, for example, Mr. Green's [j]udgment was poor by history and poor by testing." *Id.*  Based on a mental status exam, the Jester IV clinicians reported that Mr.

Green exhibited the following serious mental health problems: "ritualistic" behavior, "rambling" speech, "flat" affect, "circumstantial" thought processes, and "delusional" thought content. *Id.* at 000077. His cognition was "impaired" and "insight and judgment were poor." *Id.* The physicians and PhDs comprising the Jester IV mental health team could have effectively testified about their experience and the validity of these important diagnostic tools and results at the hearing. However, the convicting court prevented Mr. Green from sponsoring these witnesses. Moreover, the State's various concessions, such as offering to stipulate that the Jester IV witnesses would affirm they had reached the conclusions announced in the report, besides being a completely inadequate substitute for testimony from these witnesses about their qualifications, experience, methods and confidence in their findings, was simply a device to foreclose a continuance and expedite the execution of Mr. Green.

> **b.     The violation of Due Process caused by the convicting court's refusal to allow Mr. Green to sponsor Jester IV witnesses was compounded by the State's *ex parte* manipulation of credibility findings in its favor.**

By offering to stipulate that Jester IV mental health experts would testify that Mr. Green suffered from schizophrenia and was not malingering his symptoms, the State gave the impression that it was conceding these opinions should be given weight and consideration by the court. However, on direct examination the State elicited testimony impeaching the reports. The justification offered was that the State was only stipulating that the witnesses would parrot their findings if called as witnesses, but was not going to afford the reports any credence. Called on this backtracking, and faced with a renewed motion for a continuance, the State agreed to strike Moeller's criticisms of the Jester IV tests, and the court seemingly granted the motion to strike. *Transc., June 28, 2010, Evidentiary Hearing,* at 106-107.

The proposed order, which the convicting court solicited *ex parte* from the state after the court announced that June 28, 2010, evidentiary hearing was over, proved that the State's apparent concessions regarding the testimony that the Jester IV specialists were empty. (Furthermore, Moeller's testimony denying the validity of the Jester IV tests was not struck from the transcripts.).  The *ex parte* proposed order does not mention the multiple conflicts between the diagnosis and findings of the Jester IV specialists and Moeller.  The state does not stipulate in the proposed order that it drafted for the convicting court's signature that the Jester IV experts would have reaffirmed their conclusions and findings if called to testify, nor does the state's *ex parte* proposed order refer to the battery of tests that the Jester IV specialists gave or to the concordance between the Jester IV test results and Dr. Mosnik's independently made expert findings.  (Dr. Mosnik completed her report before the State disclosed the Jester IV records.)

In the teeth of professional agreement between defense expert and the mental health experts employed by the State of Texas specifically to diagnose and treat inmates, the assistant district attorney used the *ex parte* solicitation the proposed order as an opportunity to make credibility findings in favor its expert as follows:

1.      Dr Moeller was a credible witness on the question of Defendant's competency based on:

Dr Moeller's experience in the field of forensic psychiatry as detailed in his   Curriculum Vitae and testimony;

Dr.  Moeller's demeanor throughout his testimony during the evidentiary hearing;

Dr Moeller's testimony that he has worked with both the State and  the defense bar in the criminal cases with which he has been involved;

Dr. Moeller's testimony that his conclusions in criminal cases have not always favored the party by whom he was retained.

2.      Based on Dr. Moeller's credible testimony, as well as Defendant's testimony and handwritten letter to the Montgomery County District Attorney, Defendant understands that he is to be executed and that the execution is imminent.

3.      Based on Dr. Moeller's credible testimony, as well as Defendant's testimony and handwritten letter to the Montgomery County District Attorney, Defendant understands that he is being executed due to his conviction and sentencing by a jury for the capital murder of Christina Neal.

4.      Based on Dr. Moeller's credible testimony, Defendant understands that he murdered Christina Neal, and his protestations of innocence, whether based on logical or illogical claims, are being put forth because of Defendant's knowledge that he is facing execution.

5.      Based on Dr. Moeller's credible testimony, Defendant has a rational understanding of the connection between his conduct in murdering  Christina Neal and the sentence of death imposed by the jury.

6.      Based on Defendant's testimony during the evidentiary hearing, he fully understands that society both condemns the murder of innocent people and considers execution an appropriate punishment for the offense of murder.

7.      Based on Defendant's testimony during the evidentiary hearing, he agrees that execution can be an appropriate punishment for the offense of murder.

8.      Based on Dr. Moeller's credible testimony and Defendant's demeanor during the evidentiary hearing, Defendant is exaggerating his symptoms when he describes them to his attorney and mental health experts in order to further his claim of incompetency to be executed.

9.      Dr. Mosnik was not a credible witness on the question of Defendant's competency based on:

Dr. Mosnik's demeanor during the evidentiary hearing;

Dr. Mosnik's testimony that she has only worked as a mental health expert for the defense bar;

Dr. Mosnik's insistence that she could assess the genuineness of Defendant's claims about his innocence, as contradicted by Dr. Moeller's credible testimony that mental health experts have no definitive means of ascertaining whether such claims are genuine;

The clear discrepancy, as highlighted by Dr. Moeller during his credible testimony, between Defendant's objective performance

abilities described by Dr. Mosnik and the degree of subjective symptomatology she attributes to him.

*Exh. 'D', Ex parte Proposed Order signed by the convicting court*, at 2-3.

The state's credibility findings were designed to ensure that the state's expert's opinion trumped on the critical, contested question regarding the proper diagnosis of Mr. Green's mental illness and the issue of whether Mr. Green malingered or "magnified symptoms." The state's ability to make credibility assertions, moreover, was achieved through manipulation of the hearing and post hearing process. The convicting court's participation in the manipulation of the evidence against Mr. Green discredits the process to the point that deference to the state's decision is completely unwarranted.

After stipulating that the Jester IV specialists would affirm their findings in open court, the State drafted the proposed order that the convicting court solicited ex parte so that contained findings that Dr. Mosnik was not credible because she had testified five times as a defense witness, but not for the prosecution. *Id.* The State contrasted this with Moeller's record of serving two masters, the State and the defense. *Id.* Not only did the credibility finding presume without foundation that Dr. Mosnik's work in the past discredited her findings in Green's case, it purposely omits the fact that the experts employed by the Texas prison system arrived at the same conclusions that Dr. Mosnik did regarding Mr. Green's mental illness and malingering of symptoms.

Similarly, the State crafted credibility findings based on the testifying experts' different opinions regarding whether Mr. Green was malingering his symptoms. According to the findings destined for the convicting court's verbatim approval, Moeller was more credible than Dr. Mosnik, in light of what the State maintained was "the clear discrepancy, as highlighted by Dr. Moeller during his credible testimony, between Defendant's objective performance abilities

24

described by Dr. Mosnik and the degree of subjective symptomatology she attributes to him." *Exh. 'D'* at 3. However, Jester IV records reveal that numerous highly qualified witnesses could have testified that their findings supported Dr. Mosnik's determination that Mr. Green was not exaggerating his symptoms for secondary gain.

A process in which the convicting court denies petitioners the opportunity to call independent witnesses rebutting the State's expert, then solicits *ex parte* and signs off *verbatim* on credibility finding favoring the State's witness because the defense's expert had not testified as a State's witness in the past is the opposite of due process. In the vernacular, it is a "rigged" process. Mr. Green's execution should therefore be stayed, expert assistance granted and habeas proceedings on *Ford* competency commenced to ensure Mr. Green's Eighth Amendment rights are not violated.

> **2.    The convicting court's competency decision was made under circumstances that the Supreme Court in *Upton v. Jefferson* implied would make federal deference inappropriate.**

In *Jefferson v. Upton*, 130 S.Ct. 2217, 2223 (2010), the Court remarked that while "we have stated that a court's "verbatim adoption of findings of fact prepared by prevailing parties" should be treated as findings of the court, we have also criticized that practice." *Id.* (citing *Anderson*, 470 U.S., at 572, 105 S.Ct. 1504). However, the Court then outlined certain circumstances under which verbatim adoption of findings would, the Court implied, be so disfavored that deference would be withheld. The Court was clearly issuing a warning in stating that "we have not considered the lawfulness of, nor the application of the habeas statute to, the use of such a practice where (1) a judge solicits the proposed findings *ex parte*, (2) does not provide the opposing party an opportunity to criticize the findings or to submit his own, or (3) adopts findings that contain internal evidence suggesting that the judge may not have read them.

The circumstances surrounding the solicitation and execution of the proposed order in Mr. Green's case are several magnitudes worse than in *Jefferson*.  The judge not only solicited the propose order containing the State's version of the facts and law *ex parte*, she took affirmative steps, urged *ex parte* by the State, to rush the file to the TCCA so that Mr. Green would not have an opportunity to criticize or respond, and internal and extrinsic evidence suggests that the judge may not have read them.  First, the proposed order was drafted last minute, rushed to chambers and signed all within the space of ten minutes before the close of the business day to expedite the transfer of the file to the CCA and Mr. Green's execution.  The trial court did not have time to consider with any care what the State had proposed.  Second, the proposed order, as noted above, makes credibility findings based on demeanor that the State had no business projecting on the Court, and, as shown below, conflict with the convicting court's ruling from the bench and her subsequent "clarification" of that ruling.

In closing, the State argued that the issue of competency turned on which expert was more credible.  However, the convicting court did not take the State's lead. While the standards the convicting court utilized to reach the conclusion that Mr. Green was competent were either unascertainable or incorrect, the convicting court's inference that Mr. Green was competent rested on evidence related to Mr. Green's ability to perform daily tasks and to identify participants in the legal system.  However, the proposed order completely eschews these factors and the rationale the court gave for relying on them.  Instead of tracking what the convicting court stated at the closing of the hearing, the State used the *ex parte* solicitation of the proposed order as an opportunity to revive the way the State wanted the competency decision determined, which was to emphasize the type of evidence that would insulate the convicting court's opinion from judicial review and reversal.  For this reason, the proposed order is laden with

pronouncements about the demeanor of the expert witnesses, since this is precisely the type of finding that reviewing courts have repeatedly stated they will not overturn. *See, e.g., United States v. McNeal*, 955 F.2d 1067, 1071 (6th Cir. 1992) ("The trial court's decision was expressly anchored in credibility evaluations of witnesses who testified during the suppression hearing, and accordingly is beyond appellate review.").

However, instead of insulating the convicting court's decision, the State's proposed order, instead, serves as proof the convicting court uncritically adopted a document that did not, and could not, except illicitly or coincidentally, reflect her opinion.  The State did not point to features of Dr. Mosnik's presentation at the June 28, 2010, evidentiary hearing – for example, reluctance to answer certain questions in a straightforward or responsive manner – that it could reasonably assume the convicting court could base a credibility finding upon.  Rather, the proposed order purports to make findings for the court about thoroughly subjective matters.  The proposed order is replete with pronouncements about the two experts' demeanor.  However, judgments about demeanor are dependent on the particular experience that the judge brings to her office and the privileged perspective that she has from the bench as a non-partisan but critical observer.  The State could not tell what the convicting court thought of the two expert's demeanor in this case other than by shear chance or else by conferring with the judge, *ex parte*, regarding these issues.  The convicting court therefore signed off on the State's guesswork without giving any consideration, let alone the consideration expected in a capital case, or else illicitly contrived with the State *ex parte* to ground her decision after the hearing on demeanor evidence.

The proposed order that the convicting court solicited *ex parte* from the district attorney raises additional doubts about the convicting court's fidelity to Article 46.05.  The proposed

order denies that the convicting court ordered appointed psychological experts and scheduled an evidentiary hearing because Mr. Green satisfied Article 46.05(f)'s threshold standards, and states instead that Defendant fail[ed] to raise a substantial doubt as to his competency to be executed within his [Article 46.05] motion and supporting documents," but "due to the agreement of the parties, this Court ordered that Defendant be evaluated by two mental health experts."  However, this means the court flaunted mandatory language in Article 46.05 which states that "[i]f the trial court does not determine that the defendant has made a substantial showing of incompetency, the court shall deny the motion and may set an execution date as otherwise provided by law."

Furthermore, the charitable assumption that the convicting court adopted the proposed order after giving it a modicum of thought raises other very serious concerns.  Leaving the violation of mandatory statutory language aside, if the proposed order's assertion that Mr. Green's 46.05 motion did not raise a substantial doubt about his competency accurately reflects the convicting court's position, it calls into question its ability to assess competency in a fair and reasonable manner.  Mr. Green's Article 46.05 motion included medical records establishing Mr. Green had an Axis I diagnosis of schizophrenia, and affidavits from family members, fellow inmates and his counsel attesting to Mr. Green's delusional beliefs and his exhibition of florid psychotic symptoms, such as auditory and olfactory hallucinations, all of which deeply informed his beliefs about his legal and penal conditions.  Given other gross problems on display in this case, a court that maintains that the evidence presented in Mr. Green's Article 46.05 motion does not raise a colorable claim of incompetency does not deserve to have conclusions on the ultimate issue of actual incompetency deferred to.

The convicting court's July 14, 2010, "clarification" of her June 28, 2010, ruling from the bench also exposes the disjunction between her actual decision and the proposed order she

solicited from the State.[6] The clarification was not based on a fresh review of the evidence. Instead, it purports to be a recounting of the evidence that Judge Michalk considered at the hearing, coupled with an explanation of the standards she applied in arriving at her conclusion that Mr. Green was competent.  However, the July 14, 2010, reconstruction of what Judge Michalk did at the June 28, 2010, hearing conflicts squarely with the record.  The 'clarification' states at the outset that the convicting court cited *Panetti* and mentioned "other sections and standards" just to show that the convicting court had read Mr. Green's pleadings.  In conclusion the 'clarification' states that "the trial court then made a determination that Applicant was competent **solely** under Section 46.05."  On the other hand, at the close of the June 28, 2012 hearing the Court stated that she applied the *Panetti* standard, and the *Ford* standard, which she evidently thought was different, and did **not** say she was applying 46.05(h).

By disavowing the convicting court's earlier, explicit claim to have relied on Supreme Court cases, the convicting court made it more difficult, not less, to determine whether the convicting court applied constitutional standards when evaluating Mr. Green's competency. Moreover, the July 14, 2010, "clarification" states that the convicting "court is aware that 46.05 applies to this case and applied the standard set out in this statute." However, Article 46.05 contains at least three standards, including the standard of a "substantial showing of competency under subsection (d) and the "changed circumstances" standard in subsection (e).  The court did not identify which of the several standards she applied. Furthermore, instead of stating that the Court applied standards in subsection (h) that the Texas Legislature hoped would codify *Ford*, the "clarification" simply makes a showing that the convicting court  is "also aware that 46 05 states that a person that is incompetent may not be executed," and aware that Article 46.05 states

---

[6]  The July 14, 2010, clarification may not be part of the record.  Review of docket entries under TCCA cases associated with Mr. Green indicates the document was not filed.

"[i]n addition, … in part: (h) A defendant is incompetent to be executed if the defendant does not understand: (1) that he or she is to be executed and that the execution is imminent; and (2) the reason he or she is being executed."

### 3. Mr. Green was precluded from contesting the impartiality of the judge who adjudicated his competency claim despite actions that raised substantial questions of bias.

As Judge Price stressed, the TCCA "holds that the merits of" Mr. Green's appeal of the denial of the motion to recuse, "are not properly before us … [b]ecause the record of the Article 46.05 hearing had already been forwarded to this Court for our "review" under Section (l)"  The Court therefore reason[ed] that the trial court lacked authority to entertain Green's recusal motion and there is nothing for him to appeal."  However, this effectively allows a biased convicting court to insulate itself from recusal, for the convicting court has the power to order the file transferred immediately to the TCCA after ruling on the issue of competency.  Mr. Green did not have an opportunity to object to the *ex parte* findings and conclusions drafted by the State, he was denied the right to recuse the judge based on the *ex parte* manipulation of findings and fact that she solicited from the State and signed off on verbatim.  Hower, "concededly, a 'fair trial in a fair tribunal is a basic requirement of due process.'" *In re Murchison*, 349 U.S. 133, 136 (1955); *Withrow v. Larkin*, 421 U.S. 35, 46 (1975).

### 4. Serious doubts about the constitutionality of the TCCA newly minted appellate review of *Ford* competency claims militate in favor of de novo review in the federal system.

As Judge Price stated in the concurrence joined by Judge Johnson and Judge Alcala, there is a real fear that, in the Court's *Green* opinion, "the Court has inadvertently thwarted the legislative intent, essentially making law rather than accurately construing it."  The Texas Legislature's specific intent in passing Article 46.05 was to ensure that Texas courts followed

processes for determining competency that satisfied the minimal due process standards required by *Ford. See Ex parte Briseno,* 135 S.W.3d 1, 5 n.7 (Tex. Crim. App. 2004). The *Green* majority's treatment of Mr. Green's Eighth Amendment claim, therefore, in the eyes of three of the court's members compromises the Texas statutory scheme's fidelity to constitutional standards.

Before Mr. Green's case came before the TCCA, the TCCA always acted as the ultimate fact finder under Article 46.05. However, the TCCA's once settled jurisprudence changed radically with the *Green* majority's decision to apply standards applicable on direct review to competency claims raised in proceedings under Article 46.05. In *Green*, the majority reviewed the convicting court's competency determination for an "abuse of discretion" without making independent fact findings. *Green,* -- S.W.3d at *5; *id.* at *10 (Price, J. concurring). The concurrence sharply criticized the majority's reclassification of its review under 46.05 as a direct appeal. *Id.* According to three TCCA judges, the drastic revisions undermined the Texas Legislature's attempts to incorporate *Ford's* procedural due process requirements into a statutory scheme.

As applied to Mr. Green, the departure from Due Process is readily apparent. Although the Court declared the proceedings before it were appellate proceedings, contrary to *Evitts v. Lucey*, 469 U.S. 387 (1985), it afforded Mr. Green none of processes that govern appeals and make that stage of proceedings meaningful. Mr. Green did not receive a briefing schedule, or the opportunity to file appellate briefing raising objections to proceedings in the convicting court. The TCCA then compounded the errors by affording appellate deference to proceedings below that the convicting court conducted under the impression that they were governed by habeas standards. Worse, the convicting court conducted the hearing under the impression that she was

adjudicating a successive claim brought under 11.071 § 5.  The convicting court also solicited findings of facts and conclusions of law from the State, but not in accord with either 11.071 § 8 or *Jefferson v. Upton*, since the solicitation was *ex parte*, done without notifying Mr. Green or affording Mr. Green an opportunity to file his own proposed findings and conclusions.

Furthermore, the TCCA's hybridization of Article 46.05 and the Texas Rules of Appellate Procedure insulated the convicting court from recusal challenges, as shown above. The TCCA also arbitrarily enforced jurisdictional rules governing the relationship between appellate and trial courts.  Perspicuously, the TCCA solicited the clarification of the convicting court's ruling from the bench after the convicting court transferred the Article 46.05 file.  The 'clarification' that the TCCA ordered "involve[d] significant judicial discretion" and, therefore, was not ministerial or clerical. *See Rexotech California, Inc., In re; General Signal Corp. v. Rosania,* 968 F.2d 1224 (10th Cir. 1992); *Ex parte Poe*, 751 S.W.2d 873, 876 (Tex. Crim. App. 1988) (contrasting clerical actions with judicial reasoning). The TCCA, in fact, ordered the trial judge "to explain her personal thought process" in selecting standards for ruling on Mr. Green's Eighth Amendment claim. *Green,* -- S.W.3d at *8 (emphasis added).  But according to the majority, because the recusal motion was taken from the final judgment made at the June 28, 2010, evidentiary hearing, the recusal issue was part of the appellate process that the TCCA just decided governed Article 46.05 proceedings.  *Id.* at 13* (Price, J., concurring but criticizing the majority's re-classification of Article 46.05 decisions as direct appeal decisions).  According to the TCCA own reasoning, since transferring the file terminated the trial court's jurisdiction and authority to make even the non-discretionary decision "to  sign and file with the clerk an order referring the motion to the regional presiding judge" *per* TEX. R. CIV. P. 18a(f), it just as surely

terminated her authority to revise the incorrect and incomprehensible June 28, 2010, opinion she delivered from the bench.

The concurrence is correct.  The TCCA has thrown its Article 46.05 jurisprudence into confusion that threatens to violate constitutional law in all cases. In Mr. Green's case, the departures from Due Process at each stage of proceedings – in the convicting court and on appeal – are numerous and serious.  This Court should therefore grant the motion to stay his execution so that his Eighth Amendment Due Process rights are not violated.

5.  **Because of the appellate standards the TCCA applied, the convicting court's findings and conclusions are the opinion in the case for purposes of 28 U.S.C. 2254(d)**

An appellate court does not conduct its own factual review; rather, deference is given to the trial judge as the **sole trier of fact**, judge of the witnesses' credibility, and the respective weight to be given to their testimony. *Weide v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).  Hence, the decision to uphold the trial court's competency determination is not an independent assessment of the facts in light of the evidence.  Instead, it reflects the TCCA's determination that the trial court did not commit reversible error. The federal court therefore essentially must look through TCCA's opinion to the underlying decision made by the convicting court in connection with the evidentiary hearing.

As the Sixth Circuit noted, *Vasquez v. Bradshaw*, 345 Fed.Appx. 104 (6th Cir. 2009), "where an appellate court reviews under an "abuse of discretion" standard, it is not adjudicating the merits of the claim so much as the merits of the decision under review." *Id.* at 111 n. 1. Accordingly, AEDPA does not have anything to say about a state court's decision that another state court did not abuse its discretion-it is concerned only with whether the actual adjudication of the merits of petitioner's claim was contrary to, or an unreasonable application of, federal law.

*See id.*  Thus, the focus of the federal court's analysis is on the lower court's adjudication and not the appellate court. This approach finds analogical support in the refusal to give AEDPA deference to a state appellate court review for plain error. *See Benge v. Johnson*, 474 F.3d 236, 246 (6th Cir. 2007) ("Because Benge could have met his burden under *Strickland* despite not being able to demonstrate plain error, this analysis did not constitute an 'adjudication on the merits' of Benge's ineffective-assistance-of-counsel claim.") (quoting 28 U.S.C. § 2254(d)).

**B.    THE STANDARDS THAT THE CONVICTING COURT APPLIED IN FINDING THAT MR. GREEN WAS COMPETENT TO BE EXECUTED WERE CLEARLY ERRONEOUS.**

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court confronted a situation in which the Virginia Supreme Court expressed on opinion that *Lockhart v. Fretwell*, 506 U.S. 364 (1993), had modified *Strickland's* ineffectiveness standards. According to the Commonwealth, after *Lockhart* petitioners could not establish that they had been deprived of their Sixth Amendment right just upon poof that it was reasonably probable that, but for counsel's deficient decisions, the outcome of trial would have been different.  The Virginia Supreme Court held that showing prejudice also required a demonstration that the trial was fundamentally unfair. *Williams*, 529 U.S. at 372.  In a concurrence, that became the opinion of the Court, Justice O'Conner explained that the Virginia Supreme Court's decision was contrary to or an unreasonable application of clearly established Supreme Court law. Justice O'Conner acknowledged that Justice Rehnquist, in dissent, was correct to point out that the "Virginia Supreme Court also inquired into whether Williams had demonstrated a reasonable probability that, but for his trial counsel's unprofessional errors, the result of his sentencing would have been different." *Id.* at 414.  However, Justice O'Conner responded that co-presence of a legitimate analysis did not salvage the Commonwealth court's decision, since it was "impossible to

determine, …, the extent to which the Virginia Supreme Court's error with respect to its reading of *Lockhart* affected its ultimate finding that Williams suffered no prejudice." *Id.*

The Virginia Supreme Court's decision in *Williams* is a model of clarity compared to the ruling on Mr. Green's competency to be executed that the convicting court delivered at the end of the June 28, 2010, evidentiary hearing.  The TCCA could not ascertain what standards the convicting court applied, and asked for a "clarification." *Exh. 'G'*  Since the convicting court's confusion about the applicable law was so extraordinary, the TCCA could not make a simple request, but, instead, felt compelled to provide guidance to the lower court through pointed recitation of the court's numerous errors.

The TCCA first noted first that the convicting court had proceeded under the impression that she was presiding over a successor habeas petition and applying standards peculiar to such proceedings:

> On page 191 of Volume 3 of the reporter's record, the trial judge [i.e. convicting court] stated the *Panetti* v. *Quarterman,* 551 U.S. 930, 959 (2007), standard for reviewing competency claims.  Then she stated that defendants could file subsequent writ applications pursuant to Texas Code of Criminal Procedure article 11.071 § 5 and stated that it was her opinion that the burden is to show that the current claims and issues have not been and could not have been presented previously in a timely initial [writ] application or by a preponderance that no rational juror could have found those questions beyond a reasonable doubt or by clear and convincing evidence that no the specific issues (sic.).

*Id.*

However, the convicting court's confusion was not confined to a misunderstanding of the nature of the pleadings under consideration and the burden of proof to be applied; it also permeated the convicting court's beliefs about what evidence to consider in determining whether Mr. Green was competent to be executed.  As the TCCA emphasized, the convicting court,

> Further stated that it was her "understanding we're here on the first section [of Article 11.071 § 5] because of a change in [appellant's] mental capacity from the time that

[appellant was] committed in 2002 to the present." She said again later that "this is the subsequent writ." *See* Vol. 3, p. 192.

*Id.* (emphasis added).  Section 5 of Article 11.071, in relevant part, limits claims and evidence that defendants can present in a subsequent writ as follows:

> Sec. 5. (a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
>
> > (1)  the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

TEX. CODE CRIM. P., ART. 11.071 § 5(a)(1)

The convicting court's impression that "we're here … because of a change in [Mr. Green's] mental capacity" indicates that she was applying the §5(a)(1)'s requirement that the "factual basis … for the claim [be] unavailable," and was doing so in combination with Article 46.05 separate threshold provisions governing second or successive incompetency to be executed claims.  For Article 46.05 refers expressly to "changed circumstances," directs convicting courts to apply a presumption of competency, and requires a preliminary showing of incompetency based on evidence that can be so categorized in order for a defendant to proceed further on his or her claim.  *See* TEX CODE CRIM. P. § 46.05(e).  Furthermore, the convicting court appeared to think that the applicability of this admixture of successor standards was triggered by the fact that Mr. Green had raised a competency to be executed claim in the *federal petition* he file in 2007 in United States District Court. The convicting court made a point of remarking that Mr. Green had

filed a federal writ, and appeared to realize that Mr. Green had not raised incompetency in previous state proceedings.

The basis of the convicting court's June 28, 2010, decision could not be discerned even though Mr. Green's counsel gave the convicting court the opportunity to correct her misapprehensions when he objected to the application of standards governing successive writs to Mr. Green's Eighth Amendment claim.  The convicting court had unmistakably stated that she believed that the parties were "here" on a second habeas application and that "this" proceeding concerns "a subsequent writ."  However, when confronted with the error, the convicting court gave the utterly implausible explanation that the reason for mentioning "three different types of subsequent writs just to show that [she] had an understanding of the statute." *Transc., June 28, 2010, Evidentiary Hearing,* at 167.  This only underscored the convicting court's complete confusion about the nature of the proceedings before her.

Neither Article 11.071 nor 46.05 mention "three different types of writs."  However, as shown above, Article 11.071 addresses original and successor applications, and Article 46.05 also contains distinct sections that set forth standards that apply also depending on whether the movant is litigating competency as an initial matter or raising the claim again.  The convicting court's reference to multiple writs, therefore, may have an explanation; however, it is not an explanation that salvages the convicting court's June 28, 2010 ruling.  The central problem remains. The court operated under the assumption that she was dealing with a second or successive cause of action whether under Article 11.071 or Article 46.05.  In  either  case  – successor proceedings under Article 11.071 or Article 46.05 – the critical problem is that evidence is limited to new evidence or changed circumstances under these statutory provisions,

and the trial court's June 28, 2010, explanation of her ruling indicates she may have applied both limitations.

Finally, the July 28, 2010, ruling indicates the convicting court believed that Texas and federal law – *Panetti, Ford*, and Article 46.05 respectively – announced several, distinct substantive competency to be executed standards.  Quoting the convicting court, the TCCA also remarked, with evident exasperation, that the convicting court maintained "that she followed 'the Panetti standard' and applied 'the *Ford* [*v. Wainwright*, 477 U.S. 399 (1986)] standard'." *Exh. 'G'.*  Further clouding the picture is the fact that the convicting court did not state that based on the case law she was finding Mr. Green competent, but, as the TCCA saw fit to remark, said instead that "after applying all of those standards," "it was her ruling not to grant a stay." *Id.*

Summing up the difficulties created by the June 28, 2010, ruling, the TCCA stated that "several of the standards" that the convicting court referred to "were clearly inapplicable," and admitted that it "could not ascertain what standards the convicting court had relied upon" in finding that Mr. Green was competent to be executed. *Id.*  Although the rebuke was pointed, it nonetheless understated the problem.  Transcripts of the June 28, 2010, evidentiary hearing indicate the trial court may have confused standards for competency to stand trial, missed the basic significance of *Ford*, and may have confused incompetency to be executed with claims of insanity at the time of the offense. Addressing Mr. Green, the convicting court remonstrated that "you knew that you had the right to have trial counsel and appellate counsel, and further find that you appreciated the adversarial nature of the trial and proceedings. Therefore, I find that you are not incompetent." *Transc., June 28, 2010, Evidentiary Hearing,* at 166.  Summarizing *Ford,* the convicting court said "it revolved around a claim of insanity and the inability to have a live hearing and an opportunity to be heard," but did not note that the decision established the

38

substantive and procedural standards governing competency to be executed claims. *Id.* 164.  The convicting court's abjuration of *Ford* and *Panetti* and resort, in her June 14, 2010, "clarification" to Article 46.05, exclusive of these precedents, corroborates the conclusion that the convicting court did not realize the significance or authority of these seminal Supreme Court cases.

In summation, the convicting court forced Mr. Green to litigate a medically complex constitutional claim without proper notice and under conditions where competent preparation and presentation of the case was prohibitive.  The convicting court prevented Mr. Green from calling crucial witness, and cited unascertainable and incorrect standards enacted to limit evidence in successor proceedings as the basis for her decision.  After prohibiting Mr. Green from calling independent experts whose credibility could not be (improperly) impugned by their status as defense witness, the convicting court then solicited *ex parte* findings and conclusions from the state that manipulatively made Mr. Green's competency *vel non*  turn on questions of credibility, and dispatched the file at the state's *ex parte* request *instanter* to the TCCA before Mr. Green could object to the State's *ex parte* pleadings or lodge due process objections to the misconduct between court and prosecutor. Proceedings in the TCCA multiplied the errors below with an ill conceived decision to treat issues arising from a hearing that the convicting court believed concerned some sort of successor writ governed by habeas standards as though the issues were arising on direct appeal.  The state courts have, therefore, forfeited any claim that deference is owed to their determination that Mr. Green is competent to die by lethal objection. Instead, of upholding the State court's decision, this Court should stay the execution and allow Mr. Green the resources and opportunity constitutionally required to vindicate an Eighth Amendment right not to be executed while incompetent.

**C.   BECAUSE MR. GREEN IS SERIOUSLY MENTALLY ILL, AND THERE IS EVIDENCE THAT HIS CONDITION HAS MARKEDLY DETERIORATED SINCE THE LAST COMPETENCY HEARING TWO AND A QUARTER YEARS AGO, HE SHOULD BE GIVEN THE OPPORTUNITY AND EXPERT RESOURCES NECESSARY TO PROPERLY PRESENT AND EXPLAIN THE SIGNIFICANCE OF HIS CONDITION IN A FEDERAL WRIT OF HABEAS CORPUS.**

Dr. Mosnik's report and testimony explain findings, based on extensive objective testing, that Mr. Green suffers from schizophrenia. *Exh. 'A'.*  Her report confirms florid hallucinations, aural, visual and also tactile and olfactory, that are intertwined with Mr. Green's perception of his legal situation. *Id.*  The intensity of the aural hallucinations, in particular, is reflected in prison records showing that Mr. Green had stuffed so much tissue in his ear canals that irrigation was necessary to remove the impacted toilet paper. *Id.*  Dr. Mosnik also documented Mr. Green's fixed beliefs, caused by his mental illness, about his conviction and punishment.  Mr. Green's firm delusional belief is that he did not and could not have killed Christina Neal.  He also holds the delusional belief that he was convicted in a bizarre trial permeated by sexual misconduct in open court on the part of the trial judge and prosecutor.  Mr. Green persisted in these delusions while testifying at the June 28, 2010, evidentiary hearing where he was affected by auditory hallucinations that he has consistently described, whether faced with an execution date or not, as ongoing spiritual warfare between two sets of voices representing good and evil.

The TCCA acknowledged that Mr. Green presented evidence supporting the conclusion that he was incompetent to be executed. *Green, -- S.W.3d.* *10 (Price, J., concurring) ("[H]ere, evidence was presented that would support either a finding that the appellant was competent or a finding that he was not.  Not surprisingly, the appellant's expert and the State's expert were not in agreement.  The convicting court found the State's expert to be more qualified and more credible.").  The June 27, 2012, ruling that the convicting court had not abused its discretion

when it found that Mr. Green was competent refers explicitly to unreviewable credibility findings below as decisive. *Id., and see id.* at *5 (majority opinion stating that "[w]e believe that a trial court's competency determination is, if not wholly a factual determination, at least a mixed question of law and fact based on credibility and demeanor."). However, of the three candidates[7] for the convicting court's ruling – the June 28, 2010, ruling from the bench, the *ex parte* proposed order, and the June 14, 2010, *ex post* "clarification – only the proposed order solicited from and drafted by the state *ex parte* mentions credibility as a factor. Particularly troublesome is the TCCA's reliance on the ex parte finding that Dr. Mosnik was not credible because she served as a defense witness in a very limited number of other cases and had not testified as a state's witness. This indicates a prosecutorial bias on the TCCA's part, and as noted, relies on a manipulated finding, since the convicting court prevented Mr. Green from calling experts employed by TDCJ whose credibility could not be impeached on this ground.

### 1. Mr. Green deserves the opportunity to investigate and summon the TDCJ mental health expert who documented his mental illness and florid, persistent symptoms of psychosis.

Jester IV records produced by the State on June 23, 2010, corroborated Dr. Mosnik's psychological opinion and contradicted the State's experts failure to diagnose and suspicions of malingering or "symptom magnification." *See, generally, Exh. 'C'*. Mr. Green, however, was not given the opportunity to contact or summon these witnesses because the state's and convicting court's priority was to ensure that Mr. Green could be executed on June 20, 2010 as originally scheduled. In order to effectively represent Mr. Green, undersigned counsel requires funding for an investigator who can locate these witnesses, many of whom may have changed

---

[7] In the June 27, 2012, opinion, the TCCA does not appear to be basing its ruling on the convicting court's July 14, 2010, "clarification." It does not refer to the "clarification," mention that the court "clarified" her opinion, or quote language from the "clarification." However, the TCCA does quote the June 28, 2010, ruling from the bench and mentions credibility findings that could only have come from the ex parte proposed order solicited from the district attorney's office.

jobs or moved.  The authority of a court to conduct discovery is also necessary since the State

employees who treated and analyzed Mr. Green will not freely provide interviews about prison

matters.  Finally, an evidentiary hearing in federal court is necessary so that the independent

psychiatric, psychological and sociological opinions of the Jester IV specialists can be

considered in determining (i) the credibility of Mr. Green's evidence and (ii) the ultimate

question of his competency to be executed.

> **2.**   **Mr. Green can no longer perform the daily tasks that state courts relied upon in finding Mr. Green competent to be executed.**

In full, the convicting court's June 28, 2010, ruling on Mr. Green's competency to be

executed was as follows:

> THE COURT:  Okay.  I want you to know that I have reviewed all of the exhibits from the State  and the defense.  I have reviewed the letter submitted to Mr. Ligon by the defendant, the commissary notes from the State.  I've examined both of the reports from both experts.  I've taken time to go over them line by line to try to get this right because this is very important.  Panetti versus Quarterman held in 2007 that, among other things, that a criminal defense, that when they're  sentenced to death, they may not be executed if they do not have a rational understanding of the reason for their imminent execution.
>
> In Texas, defendants are granted an appeal directly to the Court of Criminal Appeals on death penalty cases.  They're also able to file a Writ of Habeas Corpus under 11.0701 of the Code and under     Section 5, it discusses subsequent writs.
>
> It's my opinion that the burden is to show that the current claims and issues have not been and could not have been presented previously in a timely initial application or by a preponderance that no rational juror could have found those questions beyond a reasonable doubt or by clear and convincing evidence  that no rational juror would have answered in the  State's favor on the specific issues.  It's my understanding we're here on the first section because of a change in his mental capacity from the time that you were committed in 2002 to the present.
>
> I've also examined the case Ford versus Wainwright.  It revolved around a claim of insanity and the inability to have a live hearing and an opportunity

to be heard, that both sides could present their case and you feel like you had a right to be heard.  I've given you that right.

It's also my understanding based on the pleadings that the sole issue in this hearing was to be on competency, but there have been several defensive theories provided, and I wrote these down prior to counsel's closing argument because they are things that struck me.  You have claimed by your testimony an alibi, you've complained you had a bad trial that wasn't fair, you complained your defense attorney at the trial counsel level was bad.

I noticed in documents you said Mr. Blazek, your appellate attorney, actually called you  back and came to see you or seemed to be better.  You claimed about -- you also claim the judge closed her eyes, that some of the jurors closed their eyes.  You've also talked about hearing voices in this courtroom and about your incompetency.

I noticed in the file, the numerous files that are here from the prior trials, that you did have an appeal, you did have a writ, and this is the subsequent writ.

The court now holds the defendant be given the right to be heard on the competency issue.  Like I said, I've reviewed the evidence.  I've also listened to Mr. -- or Dr. Mosnik and Dr. Moeller.  I've also heard your testimony and examined all the exhibits. The letters by you are compelling because they state the names of Mr. Brumberger and Ms. McConnell, the prior attorney, which show a knowledge of what's going on. They also state complaints about the racial make-up of the jury, complaints about the victim's family being in the courtroom that you noticed, and it was compelling that you knew the name of the victim.

Even though you're claiming innocence, you also knew the name of the victim in this case.  Your testimony, coupled with all of this, with also the TDCJ exhibits about how you used  toiletries, shampoo, deodorant showing you had the wherewithal to know you needed to do these things daily, I'm going to find that, based on all the evidence, that you appear to understand the reason for imminent execution[.]

[B]ut for the record, I'm going to state that the most compelling evidence of all was from your own expert, the Defendant's Exhibit 4, Page 7, which shows that you know you are to be executed by the State, you know that you are convicted of killing the victim, Christina Neal, you know the execution date, and then you proclaimed your innocence which shows a rational understanding of your imminent date and you know the charges that were against you. You knew the names of appellate counsel, the name of your trial counsel, name of your current attorney, you knew your first,

second, and third attorneys on this case.  You knew that you had the right to have trial counsel and appellate counsel, and I further find that you appreciated the adversarial nature of the trial and proceedings.  Therefore, I find that you are not incompetent and I will not grant a stay of execution and that's my ruling.  Thank you.

*Transc., June 28, 2010, Evidentiary Hearing* at 165-167.

The ruling depended heavily on findings related to Mr. Green's functioning and his fund of every day knowledge.

Despite *Panetti*'s warning about the sufficiency of this type of evidence, *see Panetti*, 551 U.S. at 960, Moeller also testified that Green's ability to write a letter and fill out commissary forms was especially important to his determination that Mr. Green was competent. *Id.* at 103. Moeller contrasted what he believed was Mr. Green's level of functioning with the symptoms of psychosis. *Id.* Moeller thought that there was "a huge disconnect between saying someone is severely, grossly mentally ill and psychotic and has [Mr. Green's] level of function, which is actually pretty good."  Contrary to *Panetti* (and to professional diagnostic guidelines), Moeller discounted the clinical features that Dr. Mosnik and the Jester IV experts noted because of Green's ability to function within the prison system.

The supposed functional abilities and fund of knowledge that led the convicting court to find Mr. Green competent, furthermore, have deteriorated since Moeller and the convicting court evaluated the evidence in this case. Moeller's opinion rested on commissary requests that Green made while in the Polunsky unit.  The commissary notes predated Mr. Green's admission to Jester IV from February 2010 through at least April of 2010.  During this period, Jester IV experts described Mr. Green as disoriented and disheveled.  They noted signs of acalculia and illogical thoughts. *Exh. 'C'* at 000076.  Mr. Green's fellow prisoner, Thomas Whitaker, lived next to Mr. Green for extended periods after the June 28, 2010 evidentiary hearing. *Exh. 'H',*

Filed under Seal.  Whitaker observed marked deterioration in Green's capabilities from the time that the Jester IV specialists first documented them. *Id.*

According to Whitaker, throughout the period he lived next to Mr. Green, Mr. Green was torpid and disoriented. *Id.*  Mr. Green's speech was inappropriate and increasingly unintelligible. *Id.* Perhaps the most striking contrast Whitaker noticed was in Mr. Green's basic abilities to perform the tasks so important to Moeller's and the court's decisions. During the extended period Whitaker lived with Green, Green had great difficulty fulfilling daily routines.  Mr. Green showered infrequently and used the day room rarely. *Id.*  When he left the confines of his cell, his conduct was bizarre and distracted. *Id.*  Furthermore, Mr. Green did not have the ability to fill out basic forms, including the commissary forms that figured heavily in Moeller and the convicting court's determination that Mr. Green's mental illness was exaggerated and in their finding that he was competent to be executed.   Mr. Green frequently required Whitaker's assistance ordering food stuffs and other items. *Id.*  Basic calculations were no longer possible for Mr. Green either. *Id.*  The apparent ability to keep track of what was in his account which so impressed Moeller no longer was evident.

In contrast to the awareness of legal proceedings and personnel that Moeller and the court thought showed competency, Whitaker also reported that Mr. Green was confused about basic aspects of his legal situation.  According to Whitaker, Green denied having an attorney even though he received legal mail. Green also could not comprehend the legal documents forwarded to him, so Whitaker had to try to explain in simplest terms what they papers meant. *Id.*  Finally, Whitaker's account of Green's behavior and verbalizations confirms that Mr. Green was constantly afflicted with florid symptoms of psychosis, persistent voices, and fixed delusional beliefs about spirits controlling his body and spiritual warfare in the prison system. *Id.*

### 3.    Mr. Green is showing signs of psychiatric comorbidities that require an expert's assessment.

Besides noticing that Mr. Green was unable to perform basic task, whether related to hygiene or commissary, Whitaker also remarks on Mr. Green's disorientation and confusion. Whitaker reports that Mr. Green  asked what day it was and appeared not to be so disoriented to time that he did not know the month or season.   Mr. Green is approaching 50 years of age, is morbidly obese, is confined in administrative segregation, and appears to be suffering from mental deficits and disorders on top of schizophrenia.  Dementia in particular is a concern given these multiple risk factors.

However, undersigned counsel cannot adequately investigate or adequately present evidence of Green's changing mentation, behavior and psychiatric comorbidities without the assistance of a mental health expert.  Nor can he competently or efficiently interview Jester IV specialists without expert assistance to frame the necessary questions and help him comprehend the nature of the tests and results that the specialists administered to Mr. Green, interpreted and reported.  Finally, Mr. Green has apparently been prescribed new or additional medications for his mental and physical infirmities. Undersigned counsel requires expert assistance to understand the possible effects of the new pharmaceutical regimen that Mr. Green is on as well as to understand the consequences of non-compliance.

WHEREFORE, Mr. Green, through undersigned counsel requests that this Court order Mr. Green's October 10, 2012, execution date vacated, and allow him expert assistance and the

right to summon witnesses in his favor, so that Mr. Green's Eighth Amendment right not to be executed while incompetent can be adjudicated in accordance with Due Process.

## CERTIFICATE OF SERVICE

On September 28, 2012, I served a copy of the foregoing motion to stay Mr. Green's October 10, 2012 execution, on Respondent via ECF filing system.

*/s/ James G. Rytting*
James G. Rytting

## CERTIFICATE OF CONFERENCE

The foregoing motion should be considered **Opposed.**  On September 28, 2012, I called Respondent's office at 512-936-1400 and was put on hold repeatedly each time after an electronic message saying "all lines are busy."

*/s/ James G. Rytting*
James G. Rytting