# EXHIBIT "A"

**Diane M. Mosnik, Ph.D.**
Clinical Neuropsychologist
Licensed in Texas (#3-1547) & Wisconsin (#2620-057)
TEL: 832.483.9732         EMAIL: 4dmosnik@gmail.com

Forensic Psychological and Clinical Neuropsychological Evaluation

June 20, 2010

Mr. James Rytting
Hilder & Associates, P.C.
Attorneys at Law
819 Lovett Boulevard
Houston, Texas    77006
TEL: 713.655.9111
FAX: 713.655.9112

**RE:** Review and evaluation of records and administration of a clinical diagnostic interview and neuropsychological examination for determination of psychiatric diagnoses and determination of competency to be executed.

**NAME:**                Mr. Jonathan Marcus Green (note: inmate reports that his name should be spelled with an "o" rather than an "a" as in "Jonathon.")
**Trial No.:**           00-1-06435-CR; Jonathan Marcus Green,
                         in the District Court 221st Judicial District, Montgomery County, Texas
**DATE of BIRTH:**       12/23/1967
**DATE of EXAM:**        06/11/2010
**REFERRAL SOURCE:**     Defense Atty. Mr. James Rytting

**Evaluation Procedures:**   The following documents and records were reviewed as part of this assessment and evaluation:

1. Medical Records of Mr. Jonathan M. Green #999421 provided from UTMB-Correctional Managed Care, Health Service Archives, including 249 pages.
2. TDCJ Medical Records.
3. Statement of Edwina Getay Taylor dated 05-24-2010.
4. Statement of James Gregory Rytting dated 05-27-2010.
5. School Records on Jonathan Marcus Green.
6. Writings from Mr. Green to his counsel and the courts.
7. Motion for Appointment of Counsel, Psychiatric Assistance and a Hearing Pursuant to Texas Code of Criminal Procedure Art. 46.05.
8. Psychiatric Examination / Evaluation Report on Jonathan Marcus Green completed by Dr. Victor Scarano in May of 2002.

**Psychological / Neuropsychological Evaluation.** A cognitive evaluation was completed with Mr. Green at the Polunsky Unit on June 10 & 11th, 2010. At that time, he was compliant with the testing procedures despite being distracted by his experience of auditory hallucinations and concerns that he was not performing to the best of his abilities because his thinking abilities were being controlled and blocked by the spirits and "personalities" who were controlling his "physical and mental functioning." The following battery of standardized tests was completed by Mr. Green:
  1. Clinical Diagnostic Psychiatric Interview.

2. Scale for the Assessment of Negative Symptoms (SANS) & the Scale for the Assessment of Positive Symptoms (SAPS).
3. Brief Psychiatric Rating Scale (BPRS).
4. Wechsler Adult Intelligence Scale-IV edition.
5. Wide Range Achievement Test-IV edition.
6. Controlled Oral Word Association & Semantic Fluency.
7. Hopkins Verbal Learning Test-Revised, version 5.
8. Brief Visual Spatial Memory Test-Revised, version 1.
9. Trail Making Test A & B.
10. Wisconsin Card Sorting Test.
11. Rey-O Complex Figure copy.
12. Symbol Digit Modalities in written and oral formats.

**Introduction.**
Mr. Jonathan Green was referred for an evaluation by his current counsel, Mr. James Rytting, to determine his competency to be executed, including whether he suffers from a severe mental disorder that could interfere with his cognitive functioning and his capacity to understand the reason for his execution. At the time of the evaluation, Mr. Green was a 43 year old, right-handed, African-American male who completed a Graduate Equivalency Course to obtain his high school diploma. He was residing in prison on the Polunsky Unit in Livingston, Texas, subsequent to a conviction for capital murder on July 15, 2002. Mr. Green was interviewed and tested by this examiner in a small room off the Polunsky Unit. The client's attorney was not present during the interview or assessment. Prison guards were located immediately outside of the testing room, but were not present inside the testing room. The client's wrist shackles were removed so that he was able to participate fully in the testing procedures. At the time of the evaluation, Mr. Green was informed that the purpose of the evaluation and testing was to ascertain whether he was experiencing a mental illness and whether or not he was competent to be executed.

Prior to beginning the interview and assessment, Mr. Green was advised of his rights in regards to the evaluation and informed that the evaluation was being conducted for the purposes of making a clinical diagnosis and evaluation of competency at the request of his current attorney, Mr. James Rytting. He was informed that he would not be provided with any therapy or treatment. He was informed that he could choose not to answer any questions or to terminate the evaluation at any time if he wanted to. Mr. Green was informed that the evaluation would not be confidential and that it would be shared with his attorney, applicable courts, and potentially others involved in the legal proceedings. Mr. Green agreed to participate in the clinical interview and testing and was compliant with all procedures, despite stating again that he had had difficulty learning in school and the "personalities and spirits within him" often interfered with his memory and his thinking, so he didn't think he would do well on the testing. During testing, he was bothered by occasional distractions from auditory hallucinations and complaints of poor memory and attention.

**Summary of Cognitive Test Results:**
(SS = Standard Score, with scores having a mean of 100 and standard deviation of 15; G.E. = grade equivalent, indicating the grade at which this score was the average score in the standardization sample.)
1. Current sight reading ability fell in the borderline range (SS = 75, G.E. = 4.9), indicating likely borderline premorbid verbal intellectual functioning.
2. Additional academic testing revealed borderline spelling (SS = 72, G.E. = 4.4) and sentence reading comprehension (SS = 79, G.E. = 8.2) abilities, while his performance in the area of mathematics fell in the low average range (SS = 88, G.E. = 7.3).
3. In regards to general verbal abilities, the client demonstrated a mildly impaired fund of general information and verbal abstract reasoning (similarities). Comprehension of social norms and basic vocabulary knowledge fell in the low average range. His overall verbal comprehension index score

   fell in the borderline range of intellectual functioning (SS = 76, 5th percentile, 90th percentile range = 72-82).
4. Overall auditory working memory ability also fell in the borderline range of intellectual functioning (SS = 74, 4th percentile, 90th percentile range = 70-81) and his performance was characterized by a borderline ability to recite randomly presented digits forward, backward, and in numerical orders (raw digits forward = 5, backward = 3, numerical = 4) and a mildly impaired ability to mentally complete orally presented arithmetic story problems.
5. Overall nonverbal, perceptual reasoning abilities fell at the low end of the low average range (SS = 81, 10th percentile, 90th percentile range = 77-87), and were characterized by moderately impaired nonverbal deductive reasoning but an average ability to construct three-dimensional blocks to match templates and an average ability to solve visual puzzles.
6. Overall visual processing ability fell at the low end of the low average range (SS = 81, 10th percentile, 90th percentile range = 76-90), and was characterized by borderline speeded transcription of digits to symbols and a low average ability to visually search for identified targets.
7. His ability to learn a list of semantically-related words, given rehearsal, fell in the moderately impaired range, with a limited learning curve compared to others his age (learning trials = 5, 6, 8/12). Delayed free recall for the words was severely impaired for his age (63% retained). Delayed recognition memory for the words was also severely impaired secondary to difficulty accurately discriminating actual from distractor items (9/12 hits, +2 F+ errors).
8. His ability to acquire a visual array of six simple geometric designs, given rehearsal, fell in the low average range for his age (learning trials = 4, 8, 9/12). Delayed free recall for the designs and their spatial location fell in the average range for his age (100% retained). Delayed recognition memory for the designs was low average (5/6 hits, +0 F+ errors). He demonstrated a preference for learning and retaining visual over verbal information, consistent with his level of intellectual functioning favoring visual spatial skills over verbal skills.
9. His ability to accurately copy a complex geometric design was intact with general maintenance of the Gestalt and reproduction of the internal details with good spatial organization.
10. Speeded transcription of symbols to digits fell in the mildly impaired range, with his oral performance falling mildly below his written performance.
11. Generative lexical fluency and semantic fluency fell in the average range for his age.
12. Basic visual motor scanning speed was mildly slow falling in the low average range for his age, but his performance deteriorated significantly to the moderately impaired range for his age on the more complex component of the task requiring rapid mental set alternation, given a slow processing speed and difficulty shifting between the two overlearned sets of information.
13. His performance on a test of novel problem solving requiring the ability to sort cards according to specific categories when provided with only limited verbal feedback regarding his performance was impaired for his age and educational attainment (Wisconsin Card Sorting Test). Specifically, his performance was error-prone and he demonstrated difficulty maintaining and shifting among alternate solution strategies. His performance was mildly perseverative and he demonstrated mild difficulty maintaining cognitive set.

**Summary of Psychological Test Results:**
14. On the Scale for the Assessment of Positive Symptoms (SAPS), the client endorsed the experience of auditory hallucinations at a moderate to marked degree, describing the experience of both voices speaking directly to him and voices conversing with each other. During both this testing session and the previous assessment session completed by this examiner on February 9, 2007, the client appeared to be actively attending to auditory hallucinations, as he would peer up to his left and mumble to voices he was hearing. During completion of one of the subtests of the WAIS-IV, letter-number sequencing, he also reported that the spirits or "personalities" within him were interfering with his ability to attend and perform the task and it had to be discontinued. He also reported that the spirits and "personalities" within him were controlling him and blocking his memory so that he wouldn't be able to remember things. In addition to auditory hallucinations, the client is also experiencing markedly severe somatic and tactile hallucinations that occupy the majority of his

attention and concern, including feeling pain and irritation and sensations as the spirits or "personalities" within him move his organs and the lesions on his skin around and cause the "evil spirits inside" to ooze out of his skin. He also reported "meat" coming out of his skin on his hands and fingers that he has had to "cut off." He also endorsed clear evidence of olfactory hallucinations characterized by smelling "all kinds of body odors" when no people were present, as well as the smell of "skunk." He also reported that the spirits or "personalities" within him "make him see visions" of things that have happened or are going to happen in the future, things he does not want to see. In addition to hallucinations, the client spoke incessantly about a fixed delusional system in which he firmly believes that he is not in control of his own physical and mental functioning; that his body and mind are being controlled by a group of entities, that he variously refers to as "spirits or personalities" that reside within him and control his body's movements (i.e., make him engage in various behaviors against his will and his own wishes, such as hurting himself by having to cut "pieces of meat" off of himself to get rid of the evil spirits within him and banging his head against the wall), his senses (i.e., can make him blind, mute or deaf when they so choose; delusions of control), planting their thoughts in his mind so that he cannot have thoughts of his own (thought insertion), and interfering with his memory, so that he cannot learn or remember things in order to help himself, including interfering with his ability to help himself with his legal case by blocking his memory for information that he feels could have helped him during his trial. He appears to be suffering from markedly severe persecutory delusions that preoccupy the vast majority of his time. In addition, he describes experiences consistent with severe, complex, well-formed somatic delusions with accompanying somatic/tactile hallucinations involving what he perceives as significant and constantly changing alterations to his body and physical appearance, including the existence of "knots" or "lesions" on his scalp and skin, discolorations of his skin, the appearance of "evil" substances "oozing" out of his body as a result of the war between the "good and evil personalities constantly fighting for control of his body in order to kill him." According to his medical records, he has sought medical attention on numerous occasions in order to deal with these perceived bodily afflictions and physical alterations which cause him significant emotional distress. The vast majority of his conversations, even during attempts by the examiner to engage in "small talk" with him, were comprised solely with his thoughts and beliefs relating to his delusional system. Although his "story" is comprised of numerous details relating to the entities residing within him, his speech is fraught with positive formal thought disorder, such that his speech and train of thought are difficult to follow given his markedly severe illogicality and loose associations. He demonstrated a consistent pattern of speech in which the conclusions he draws do not follow logically; however, he strictly adheres to his convoluted delusional system even when challenged or questioned by the examiner about the illogicality of the conclusions. He becomes mildly agitated when his delusional belief system is challenged too strongly, but states that he does not know exactly how the personalities control his functioning. Despite questioning, his story has remained very consistent, even in its illogicality, over time and in the presence of all who come into contact with him, including his attorney (as described in the "Statement of James Gregory Rytting dated 05-27-2010") and family members (as described in the "Statement of Edwina Getay Taylor dated 05-24-2010"). On numerous occasions during the evaluation, the client made statements that the spirits or personalities that resided within him were also within other people, stating that they were "moving [the examiner's] clothes around" and "doing things to your [the examiner's] body, but not hurting you." The client frequently incorporated actual information from the news and the environment and his legal case into his delusional system and factual information became intertwined and inseparable from his created, fixed delusional belief system, including comments made by prison guards, medical and mental health professionals, and his own execution. When asked why the spirits / personalities were messing with him, he stated, "I guess they want me just not to know things and be dumb. That's why I can't spell good or remember things. They don't want me to be successful and they want me to die for this murder, even though I am innocent; they want me to die anyways." When the examiner asked why they would want to kill him if he was innocent, he replied, "They been tryin' to kill me since I was a baby; they the ones killin' people. There are some good ones that help me sometimes; they stop 'em for awhile sometimes from hurting me. Sometimes

they can't do nothing about it." "They make me have all kinds of feelings; they control that also, you name it, they do mentally and physically to my body." "I'm not trying to cause trouble. They're making me; they try to get me in trouble here and I can't move. They won't let me move and will make me spit on someone. They made me spit on a guard 'cause he was wearing a shirt with five flames on it. They made me spit at him; they mad at him, called him a fraud." He further stated, "My momma, they killed her. She was sitting in her car and something pushed her head back. I was crying and I said 'you want to go to the hospital and she stayed alive until an ambulance came and took her to the hospital, but they couldn't save her. The doctor said the brainstem; they broke her brainstem. I didn't understand now till later." He further stated, "I told my other lawyer what they were doing to me, he passed away. I think they killed Michael M. for trying to help me and he called up here and told the warden and the warden told him to go f* himself in the a*, basically saying he wasn't going to help me."

15. On the Scale for the Assessment of Negative Symptoms (SANS), the client demonstrated moderately severe symptoms of affective flattening / blunting (a flat wooden facial expression), a paucity of expressive gestures, marked affective nonresponsivity (essentially no emotional response to examiner's thoughts or questions apart from complete obsession with his own delusional beliefs), limited eye contact or staring at the examiner with very limited blinking, and a lack of vocal inflections even when he was speaking of situations and beliefs that appeared to be causing him distress (i.e., bodily control and pain inflicted on him by the personalities). He also demonstrates alogia, poverty of content of speech as much of his speech is lacking content, and apathy.

**Behavioral Observations.**
The client was brought to the small examining off the Polunsky Unit in Livingston, Texas, by prison guards. He presented voluntarily for the assessment. He was assessed with his hands unshackled and his feet shackled. He was awake and alert during the assessment session, but demonstrated variable attention, given distractions by what appeared to be active auditory hallucinations to which the client responded. He was generally well-mannered and fully cooperative with the evaluation procedures. He presented as a rather large, middle-aged African-American gentleman of medium height. His behavior was appropriate to the situation in that he listened and responded to the examiner's questions. On several occasions, he became distracted by hallucinations and questioning the examiner about how he could receive help and treatment for his numerous physical complaints (e.g., "knots" on his scalp, skin discolorations, distortions to his body, and the movement of various organs around his body). He was polite and able to listen to the examiner and follow basic commands and test instructions. His personal hygiene was fair, with mild body odor apparent. He was dressed in prison clothing. Vision and hearing appeared intact, although the client stated that the personalities were controlling and interfering with his vision and hearing. He was oriented to basic personal information and his current location and the current date and time. Mood appeared flat and affect was restricted in range, with significant affective nonresponsivity. He became mildly frustrated on tests of memory functioning as he demonstrated difficulty retaining information and complained that the personalities inside him were blocking his memory performance. However, he exhibited no emotional outbursts or episodes of anger or inappropriate tearfulness or laughter. He demonstrated very limited facial expressiveness and rare use of expressive gestures. Eye contact was poor and consisted mainly of staring at or past the examiner with decreased blinking. During the testing, he had difficulty directing and sustaining his attentional resources. His thought processes were illogical in regards to his speaking about his beliefs, but goal directed in regards to completing the test procedures. On occasion, he lost his train of thought due to tangential responses to questions. He responded to all questions posed. He was able to follow basic test instructions and commands, with some difficulty on lengthier and multi-step commands secondary to attention and memory impairment. Language expression was generally fluent in conversation, though notable for formal thought disorder characterized by illogicality and poverty of content of speech. There was no evidence of echolalia or clanging. Spontaneous conversational speech was flat with decreased prosody and inflection, but otherwise within normal limits in terms of rate, rhythm, and volume. In general, his responses were

perseverative but not impulsive. His processing speed was slow for his age. No signs of any motor abnormality were observed, including tremor or rigidity. He ambulated unassisted and gait and balance appeared within normal limits for his age although his gait and balance were somewhat affected by his ankle shackles. He demonstrated limited motor movement during the testing session. He appeared to have some insight into his current short-term memory impairment though this was attributed to the spirits and personalities controlling him rather than to memory impairment per se or that associated with a mental illness. Test findings are believed to represent an accurate portrayal of his current cognitive and neurobehavioral functioning.

**Medications.**
A review of the client's medical records from January through March of 2010, indicated that he was seen by a mental health practitioner and diagnosed with Schizophrenia, undifferentiated type. His medical record indicated he was being prescribed chlorpromazine (Thorazine, a typical antipsychotic medication) initially and then trifluoperazine (Stelazine, a typical antipsychotic medication, 5 mg twice a day), in addition to diphenhydramine (an antihistamine), naproxen (a nonsteroidal anti-inflammatory medication), and ranitidine (a histamine H2-receptor antagonist that inhibits stomach acid). He was reportedly also advised by his physician to take a medication to control his elevated blood pressure but reportedly refused, stating that there was nothing wrong with his blood pressure and the medication would not help because it was the spirits in him that were responsible for messing with his blood pressure. Unfortunately, the frequency with which the inmate was taking these medications could not be determined by the records available at the time of this assessment. According to the inmate on direct questioning by this examiner, he would take the medications "on occasion," but stated that the physician had told him that he "had a chemical imbalance" that "could not be cured" and the medication may or may not help. The client stated that he did not believe that he needed medications, but felt that he needed to see "a neurosurgeon who could operate on his brain to release the demons, spirits, and personalities fighting for control inside of him." He stated that he believed he could be released from pain if a "medical doctor could open up his brain to see what was inside" then he could fix it. It is unclear whether or not the inmate had taken any of his prescribed medications on the day of the assessment.

**Summary of Diagnostic Impression.**
Mr. Green exhibited the persistent experience of symptoms characteristic of individuals diagnosed with a serious psychotic disorder, namely, markedly severe delusions, hallucinations, and formal thought disorder that interfere significantly with his overall level of functioning and have been present for greater than six months. In regards to his cognitive functioning, he demonstrated moderately impaired learning and memory for verbal information, attentional impairment, and executive dysfunction characterized by impaired problem-solving and mental set shifting; cognitive dysfunction consistent with the pattern of cognitive impairments typically seen in individuals diagnosed with schizophrenia (Gold & Harvey, 1993; O'Carroll, 2000). Given the pattern and severity of his symptomatology, in conjunction with his pattern of cognitive deficits, he meets criteria for a diagnosis of Schizophrenia, undifferentiated type. Specifically, he demonstrated auditory hallucinations consisting of voices commanding him to engage in certain behaviors and voices conversing with each other but allowing him to hear them, somatic / tactile and olfactory hallucinations, delusional ideation, paranoia, disorganized speech with evidence of formal thought disorder (evidenced by illogicality in his spoken and written language), and the negative symptoms of loss of affective responsivity, alogia, and poor attention. His overall general intellectual capability fell within the borderline range of functioning (SS = 74, 4th percentile, 90th percentile range = 71-78), as did his performance on measures of academic functioning, including reading, reading comprehension, and spelling. As such, he also meets criteria for a diagnosis of Borderline Intellectual Functioning, which is consistent with the poor grades he achieved during his formal schooling.

It is the clinical judgment of this examiner that Mr. Green is suffering from a persistent psychotic condition at the present time that is impacting his ability to accurately comprehend and fully appreciate his current situation. It is further evident, that Mr. Green does not have an understanding of or insight

into his own mental state or an appreciation of his experiences as symptoms of a mental illness, but rather that his experiences are real.

**Assessment of Competency to be Executed:**
Under the Texas Code of Criminal Procedures 46.05 (f). subsection (h), "[a] defendant is incompetent to be executed if the defendant does not understand: (1) that he or she is to be executed and that the execution is imminent; and (2) the reason he or she is being executed." *Id.* In Panetti v. Quarterman, 551 U.S. 930, 959 (2007), the Supreme Court ruled that in order to be found competent, a defendant must have some "rational understanding" of the reason for his execution. *Id.* "A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Id.* The Court explained, "The potential for a prisoner's recognition of the severity of the offense and the objective of community vindication are called in question…if the prisoner's mental state is so distorted by a mental illness that his awareness of the crime and punishment has little or not relation to the understanding of those concepts shared by the community as a whole." *Id.* In particular, the Supreme Court concluded that "gross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve on proper purpose." *Id.* at 960.

During the assessment, Mr. Green was questioned directly regarding his understanding about his upcoming execution. Specifically, the examiner asked:
1. What is your understanding of why you are here (on the Polunsky Unit [not stated])?
    The inmate replied, "They put me in here to kill me."
2. Who is "they"?
    The inmate replied, "The State of Texas. They want to kill me."
3. When were you put here?
    The inmate replied, "2000. June 17th, 2000."
4. What is the name of this place?
    The inmate replied, "Polunsky Unit."
5. Why did they put you here?
    The inmate replied, "They say I killed someone, but I didn't; people lie; the jurors lied and they set me up and the jurors wouldn't help me to see the truth; they were sleeping. The attorney told me to my face that they wouldn't help me, but I couldn't think to tell the judge. These things [spirits] won't let me think to help myself."
6. Who was killed?
    The inmate replied, "This girl, Christine Neals."
7. Why would they say you killed her?
    The inmate replied, "They say the body was…[he stopped talking] but I wasn't living there; I was living with two different women at the time and wasn't home. The officer tested the body on my behalf, tested in my house, wrong. They done wrong in the house and set me up. A law officer testified in the court room that they were doing something to set me up and they still put me in here. The jurors and the judge was sleeping on the trial. I forgot he was no good, the lawyer. He told me, 'I guess I'll help you.' And he accused me of rape. I couldn't remember, I would have told that to the judge and get a new trial."
8. Do you understand what "competency to be executed" means?
    The inmate replied, "Only what you tell me. You evaluate me to see if I'm smart enough to die I guess."
9. Do you know that you are going to be executed?
    The inmate replied, "I hope not."
10. Have they told you you will be executed?
    The inmate replied, "They gave a date."
11. A date?
    The inmate replied, "On the 30th of this month. I guess it's still hope, I don't know."
12. How long of a time away is that?

        The inmate replied, "18 – 19 days."
13. What is the reason for the execution, why are they going to execute you?
        The inmate replied, "They accused me of killing somebody and they sentenced me to deathrow but I'm not guilty."
14. If you are not guilty, why are they executing you?
        The inmate replied, "I just told you the lawyer did not help me and the judge and the jurors were sleeping and telling lies about me. The judge was raising her skirt up and showing people herself and telling the Das to jump in and out of each other's laps. She was sleeping on 30 minutes or an hour with her eyes closed."

### Summary of Competency to be Executed Questioning:

It is the opinion of this examiner, that while Mr. Green is able to state that he has been scheduled by the State of Texas for an execution on the "last day of June," which is "18-19 days" away, he does not have a "rational understanding" that he is being executed as punishment fitting a crime that he committed so that he will not be able to commit the same crime again.

Because of the nature and severity of his delusional belief system caused by his mental illness of schizophrenia, he does not believe that he is responsible for committing a crime. He believes that he was "set up" and is being put to death for a crime, not because he committed it, but because the spirit personalities warring within him have been trying to kill him since he was baby. He also reported that these spirit personalities killed his mother and are also responsible for the deaths of others, including one of his attorneys. Mr. Green's firmly held delusional beliefs are fully intertwined with and alter his understanding of how he came to be on deathrow, why he is being held on deathrow, and why he is being executed. This severely delusional belief system precludes him from having a rational understanding of a connection between his personal conduct and the death penalty that he is awaiting.

It is the opinion of this examiner that the severity of the mental illness with which Mr. Green suffers prohibits him from having an awareness or understanding of a connection between the crime and its punishment that the punishment imposed cannot serve the purpose for which it was intended.

In regards to Mr. Green's understanding of his current situation, he does not believe that he is being punished for a crime he committed, or even being punished for anything, but rather is being set up "in the game" so that he will be killed because the warring spirit personalities within him want him to be dead.

In summary, it is the opinion of this examiner that Mr. Jonathan Marcus Green is not competent to be executed.

Given the severity of his mental illness and the fixed nature of his delusional belief system, in combination with his history of very limited, if any, treatment for his mental illness, it is questionable whether he will ever respond to antipsychotic medications to the degree to restore his competency. However, it is recommended that the client receive pharmacological treatment for schizophrenia.


Respectfully submitted,



Diane M. Mosnik, Ph.D.
Licensed, Clinical Neuropsychologist

References:

Gold, JM, & Harvey, PD. (1993) Cognitive deficits in schizophrenia. *Psychiatr Clin North Am.,* June;16 (2): 295-312.

O'Carroll, R. (2000) Cognitive impairment in schizophrenia. *Advances in Psychiatric Treatment*, 6: 161-168.